HARRY CLAYTON POVEY, executor, &c., et al.,

*v.*

MATTHEW J. READY et al.

---

MARCUS D. TRAURIG et al.

*v.*

HARRY CLAYTON POVEY, executor, &c., et al.

[Submitted December 27th, 1916.   Decided February 19th, 1917.]

Under the evidence in this case—*Held*, that the judgment was fraudulently obtained and should be set aside, and the sheriff's sales thereunder declared void, and that all property obtained thereunder should be reconveyed and returned.

---

Heard on bill, answer, replication and proofs.

*Mr. Arthur Harris, Mr. William L. Brunyate* and *Mr. Ralph Lum,* for the complainants, Harry Clayton Povey and others.

*Mr. Philip J. Schotland,* for the complainants Marcus D. Traurig and others.

*Mr. Thomas S. Henry,* for the defendant Matthew J. Ready.

*Mr. Edwin C. Caffrey* and *Mr. Alfred F. Skinner,* for the defendant Edwin D. Kenyon.

*Mr. William Greenfield,* for the defendant Jane A. Taggart.

FOSTER, V. C.

These two cases were tried together. The second action is on a bill of interpleader, and was brought as a result of the situation presented in the first suit, which is brought to have a judgment obtained by Matthew J. Ready against one John Boyle, and all sales and proceedings thereunder set aside as fraudulent.

At the hearing it was established by complainants that John Boyle, a resident of Irvington, in Essex county, in this state, died on January 16th, 1916, leaving a last will and testament, of which the complainant Harry Clayton Povey was named as executor, and that Mr. Povey has duly qualified and is acting as executor, and that the other complainants, in the first suit, Elizabeth B. Gordon and Alice Deroussen, are the sole devisees under this will.

Mr. Boyle, at the time of his death, was about seventy years old, and had accumulated property worth about $30,000.

About ten years prior to his death he had married Florence Rooney, who was then about fifteen years old. In 1907, Boyle and his wife had some difficulty, and the defendant Matthew J. Ready, representing the wife as her solicitor, secured from this court a decree for a weekly allowance of $8 for her separate maintenance.

Later, Mr. Thomas S. Henry was substituted as solicitor for Mrs. Boyle, because of Mr. Ready's suspension from the bar in

1908; and still later, in 1912, Mrs. Boyle was represented by the firm of Michael T. & Hugh C. Barrett.

In 1910, while under suspension, Mr. Ready was connected as a clerk or in some other capacity with the law office of Helm & Knight, and, during a part of 1910 and 1911, he was either in Bermuda or Chicago.

In February, 1912, Mr. Ready's suspension was vacated by the supreme court, and he resumed the practice of law and was then employed by Mr. Boyle to straighten out the title to his properties and to adjust the claim of his wife for her separate maintenance allowance.

At this time Boyle was the owner of property at Market and Jackson streets, Newark; another property on Bruen avenue, Irvington, the title to which stood in Boyle's name as trustee for Elizabeth B. Gordon, and another property situate on Market street, Newark, the title to which stood in the name of Elizabeth B. Gordon as trustee for John Boyle. Ready claims that when Boyle employed him in 1912 to act as his attorney, the employment was on a contingent fee basis by which he was to receive "ten per cent. of the sale price of the property at Market and Jackson streets and $5,000 for vacating the chancery order and for getting Boyle control of the other property adjoining the Market and Jackson street property."

In June, 1912, Boyle sold the Market and Jackson street property to the Traurigs, the complainants in the interpleader action, for $25,000, receiving $10,000 in cash and a first mortgage on the property for the balance of $15,000. Mrs. Boyle did not join in the deed for this property.

Because of Ready's refusal to act, Boyle retained John E. Helm to represent him in contempt proceedings arising out of his failure to pay Mrs. Boyle the $8 weekly allowance, and, in 1913, Boyle consulted with Mr. Charles C. Pilgrim about his property and domestic affairs, and later he retained Eugene H. Meyer to act for him in regard to his wife's allowance and to secure evidence against her, if possible, as a basis to force her to release her interest in his property. Meyer received $250 from Boyle as a retainer and a written promise that $1,250 more was to be paid him by Boyle for his services. Ready claims this

arrangement was made with Meyer with his knowledge and approval, because Ready refused to handle this part of Boyle's affairs, and he further claims that he and Boyle had an understanding that Meyer's fee was not to interfere with Ready's fee, and that he probably wrote the agreement between Boyle and Meyer fixing the latter's fees.

During 1912 and 1913 Ready claims he was endeavoring to obtain Mrs. Boyle's signature to deeds for her interest in Boyle's properties, and to obtain her consent to vacate the order for her separate maintenance, and, finally, some time in January or February, 1914, a settlement was effected by Ready with Mrs. Boyle, through Messrs. Barrett, her attorneys, for $2,250; and, some time in the latter month, Ready sent his bill to Boyle for his services. Ready claims Boyle admitted the correctness of the bill, but wanted time in which to pay it, and Ready says Boyle suggested that he add $200 to the amount of his bill as an inducement for Ready to give Boyle time for its payment. About this time Boyle and Mrs. Gordon, who was his housekeeper, and probably lived with him as his wife, had some trouble and she left him. It was then that Boyle consulted Ready about the condition of his properties in which, as stated, he held title to one as trustee for Mrs. Gordon, and in which she held title to the other as trustee for Boyle, although she actually had no interest in either property. Ready, after a week's delay, told Boyle he could fix the matter up by bringing suit against Boyle, obtaining judgment, and selling the properties to satisfy the judgment, and in this way he and Boyle could also secure some money they needed; and, accordingly, Ready brought suit against Boyle, and, on May 12th, 1914, judgment by default was entered therein, in the Essex county circuit court, for $7,-425 damages and $387.74 costs.

The complaint in this action contains six items which are as follows:

"(1) In the month of March, 1912, defendant retained plaintiff as his attorney to transact various legal matters for him.

"(2) That in the month of April, 1912, plaintiff attended the first criminal court, part 2, in Van Buren street, Newark, New Jersey, at defendant's request, for which service plaintiff claims $50.

"(3) That on or about the twenty-fourth day of June, 1912, plaintiff made a search of premises No. 10 Bruen avenue, Irvington, New Jersey, for said defendant and passed title thereto for him at his request, for which services plaintiff claims $175.

"(4) That on or about the last-mentioned date, plaintiff obtained for said defendant at his request $10,000 in cash and a first mortgage for $15,000 on property corner Jackson and Market streets, Newark, New Jersey, for which services said defendant agreed to pay plaintiff $2,000.

"(5) That on or about the 17th day of August, 1912, plaintiff obtained possession of $600 piano for said defendant at his request, for which service defendant agreed to pay plaintiff $200.

"(6) That on or about the twenty-seventh day of January, 1914, plaintiff settled the defendant's chancery troubles between said defendant and his wife, at his request, by having the decree in chancery therein against the defendant vacated and by settling up property rights belonging to said defendant, amounting to a large sum of money, for which services said defendant agreed to pay plaintiff $5,000."

Considering these various charges in the order stated in the complaint, Mr. Ready states, in regard to item number two, $50 —a charge for services in the first criminal court, that he cannot recall what it was about, what services he rendered, or what the title of the matter was, as he kept no docket or books of any kind.

Regarding item number three, the charge for $175, it appears the property on Bruen avenue, to which this charge relates, was purchased by deed dated June 19th, 1912, from the proceeds of the sale of the Market street property on June 18th, 1912, and that Ready, according to his complaint, rendered services in searching and passing title to this property on or about June 24th, and it also appears that Ready did not search the title to this property, but that he employed one Reilly to do it for him at a cost of about $100, and that Ready was not present, at Boyle's expressed request, when Boyle took title to the property and paid the purchase price of $5,000 therefor; although the item in question states that the charge is made not only for the search but for Ready's services in passing title to the property at Boyle's request. It further appears that on June 14th, 1912, ten days before these services are claimed to have been rendered, Ready received from Boyle $55 on account of $300 for legal services to be performed, but it does not appear if the balance of this amount was paid or what was the nature of the legal ser-

vices to be rendered, unless it was, as Ready explains, that after the contract for the sale of the property at Market and Jackson streets was closed, he was to have the property sold for taxes of about $80, in order to clear up the title to be given the Traurigs, and, after settling with the city comptroller, he was to have what remained out of the $300.

The fourth item of the complaint is the charge of $200 for replevining a $600 piano in the district court. This piano had been bought seventeen years before the replevin suit for $170. Ready at the time this action was brought was under suspension from practice, and the action was actually brought in the name of Helm & Knight, as attorneys, and charged for by them.

The remaining item of the complaint is the charge of $5,000 for settling Boyle's trouble with his wife for $2,250, and in settling up property rights belonging to Boyle.

Mr. Hugh C. Barrett, who acted on behalf of his firm in representing Mrs. Boyle, says she never asked more than $2,500 for the settlement of matters between herself and Mr. Boyle; he contradicts Mr. Ready, who claims Senator Barrett was actually representing Mrs. Boyle, and states that because of his illness Senator Barrett had very little, if any, knowledge of the matter, and that he personally conducted negotiations for a settlement with Mr. Eugene Meyer, and not with Mr. Ready, until a few days before the settlement.

In explanation of this charge, Ready states that Boyle was very much worried over the amount of $8 which he was compelled to pay his wife weekly; that he claimed if it continued it would impoverish him; that it represented the interest of five per cent. on nearly $9,000, and that he couldn't afford to pay it any longer. By the settlement with Mrs. Boyle these weekly payments were ended and her dower rights in Boyle's properties were released. To effect these results, and for clearing up Boyle's property interests, Ready claims Boyle agreed to pay not only $2,250 to Mrs. Boyle, but $5,000 to him, or a total of $7,250, the interest on which at five per cent. is within $100 a year of the amount Boyle had been paying his wife. Ready did not clear up the difficulties connected with the other property owned by Boyle on Market street, Newark, or on Bruen avenue, Irvington.

Under the judgment obtained by Ready for the above charges, execution was issued on May 13th, 1914, and on June 8th, 1914, the sheriff of Essex county, by virtue thereof, sold, in the presence of Ready, Boyle and Alice Deroussen, one of the complainants, and Boyle's niece, all of Boyle's personal property to Alice Deroussen for $1,000. Included in the levy was the purchase-money mortgage for $15,000 given by Traurigs to Boyle. Mrs. Deroussen never paid the amount of her bid, never received a bill of sale for the property, and supposed she was buying in the property for her uncle.

On August 18th, 1914, under this execution, the real estate on Bruen avenue, Irvington, in the name of John Boyle, as trustee, was sold by the sheriff to Mrs. Deroussen for $1,000. She never had a deed for the property delivered to her and never paid the amount of her bid and supposed she was also buying in this property for her uncle, "to get him out of the tanglement of his property," for which purpose she heard Boyle and Ready agree that the judgment should be obtained and the property sold thereunder; and that Ready admitted to Boyle that the judgment was taken only for this purpose, as Boyle did not owe him anything. Ready states that Mrs. Deroussen's testimony on this point "is half the truth and half a lie." Mr. Boyle, after these sales, continued in the possession, use and enjoyment of both the personal and real property, and collected the interest and income therefrom.

After Boyle's death in January, 1916, and on April 11th, 1916, the defendant Jane A. Taggart brought an action of replevin for some of the personal property, including the horse which Mrs. Deroussen had purchased at the sheriff's sale on June 8th, 1914, and an examination of the records then disclosed that on August 17th, 1914, a bill of sale for this personal property from the sheriff to the defendant Jane A. Taggart had been recorded, and that on April 13th, 1916, a deed from Mrs. Deroussen and husband to the defendant Jane A. Taggart for the property at Irvington had been recorded. This deed bears date August 18th, 1914, the date Mrs. Deroussen supposed she had bought in the property at the sheriff's sale, and the certificate of acknowledg-

ment is signed by the defendant Ready; the consideration is stated to be "$1,000 and other valuable consideration."

The explanation of the execution of this deed given by Mr. and Mrs. Deroussen, who are an elderly respectable couple, with very little knowledge of law or of legal papers, is, that shortly after the day of sale, Ready, accompanied by Mr. Boyle and some others, called at the Deroussen home on Long Island; that they appeared to be in a great hurry; that Ready briefly explained that before. Mrs. Deroussen could obtain title to the property it was necessary for her to sign the sheriff's deed, and she and her husband thereupon signed and acknowledged the deed, receiving no consideration therefor and thinking she was taking title for her uncle John Boyle. They did not then, and do not now, know Miss Taggart, except as they have seen her in court during the hearing.

After Boyle's death, and about March 20th, 1916, Ready assigned the judgment he had obtained against Boyle to the defendant Edwin D. Kenyon, a New York lawyer, and a friend of Ready and Helm, for the stated consideration of $5,000. Of this amount Mr. Kenyon states that only $500 was paid, the balance was not paid because of this suit. This $500 Mr. Kenyon states was paid in cash when Ready gave him the assignment, and he gave Ready nothing to show that $4,500 of the consideration remained unpaid, or when it was to be paid, but after making this payment of $500, he gave the assignment to Mr. Ready to have it recorded, and took no receipt from Mr. Ready for the assignment or for the $500 which he had paid him.

The explanation of these transactions given by the defendants Ready and Jane A. Taggart is, that Mr. Boyle was indebted to Ready for $7,500; that he was unable or unwilling to settle with Ready when asked to do so; that they frequently had quarrels about a settlement and about Ready's and Boyle's need of money; that at the end of one of these quarrels, Helm, the employer or partner of Ready, suggested that Ready sue Boyle, obtain judgment against him, and either raise money on the judgment or hold it as security. Acting upon this suggestion, Boyle thereupon allowed Ready to obtain the judgment by default; that

thereupon Boyle's property was levied upon and advertised for sale by the sheriff.

Shortly before the sale of Boyle's personal property was to take place, Boyle told Ready that in order to raise some money for both of them he would be willing to sell the Traurig mortgage, the principal of which was then $12,750, and the property on Bruen avenue, Irvington, worth between six and seven thousand dollars, and his household effects, horse and carriages, for one-half of their value, if he could continue to collect the interest on the mortgage and occupy the house and use his personal effects so long as he lived. Ready thereupon brought the matter to the attention of Miss Taggart, who some years before had been employed by him as a clerk and typewriter, and who some years before had employed Ready in her roofing business, during his suspension from practice. Ready pointed out to Miss Taggart how she could make money by accepting Boyle's offer and persuaded her to invest her savings in the purchase of Boyle's properties. Miss Taggart met Boyle and Ready and agreed to buy the personal property and the Traurig mortgage for $4,500, upon the condition that the bond and mortgage should be turned over to her when she paid the money and Boyle had executed and delivered an assignment of them to her, subject, however, to Boyle's right to collect the interest as long as he lived. She also agreed to buy Boyle's real estate at Irvington for $4,000, subject to Boyle's right to occupy the same for life on the payment by him to her of an annual rental of $50, and all taxes, water rents, assessments, &c. She would not, however, buy the real estate at sheriff's sale, as she thought a sheriff's deed worthless, and insisted on having a warranty deed. Boyle agreed to have his niece buy in the real estate and convey the same to Miss Taggart by warranty deed. The sheriff in his original levy had not included the Traurig mortgage, but at Ready's suggestion this was added, and on the day of sale they say Mrs. Deroussen was not present; that as the deputy was about to sell the personal effects Miss Taggart produced $4,500 in money, which she handed to Ready or Boyle, and in return Boyle handed her the bond and mortgage, but not an assignment of them. Ready then bid in the personal property in Miss Taggart's name for $1,000,

although she says it was worthless and that she would not give $200 · for it.   Mr. Boyle never executed an assignment of the bond and mortgage, and the mortgagors were never notified during his lifetime of their sale to Miss Taggart, or anyone else. After the sale of the personal property Ready had Boyle examined in supplementary proceedings—for what purpose or object does not appear—and later the real estate at Irvington was sold by the sheriff to Mrs. Deroussen, who later conveyed the same, to carry out the agreement claimed to have been made between Mr. Boyle and Miss Taggart.   This deed from Mrs. Deroussen contained a provision that the conveyance was made subject to a life interest therein of John Boyle on the payment by him of $50 annually to Miss Taggart, and also all taxes, water rents, assessments, &c.   Miss Taggart claims that at the time of the sheriff's sale of the real estate she paid $1,200 on account of the purchase price of $4,000, and obtained a receipt therefor from Ready, and in the following January she says she paid the balance of $2,800 and received a receipt therefor from Ready, who then delivered to her the deed from Mrs. Deroussen.   At the· time Miss Taggart claims to have paid the $4,500 for the personal property, Ready claims he took the money and counted it and retained $2,000, which he applied on account of his judgment, and gave the remaining $2,500 to Boyle.   The bid of $1,-000, which Ready claims he made for Miss Taggart for Boyle's personal property, was only a fictitious one; no payment was made to the sheriff or his deputy, but Ready gave the sheriff a receipt for $1,000 on account of his judgment and execution. Neither was the $1,000 paid for or by Mrs. Deroussen when she bid in the real estate, but Ready at the time of receiving the sheriff's deed gave the sheriff a receipt for. $907 and paid the sheriff's fees.

Miss Taggart claims that the $8,500 which she paid for Boyle's real and personal property was money which she had saved from her earnings and investments.   It appears that she worked as a clerk for Ready for about a year, nearly ten years ago.   She received a salary of about $12 a week, and made in addition about as much more from outside work.   When Ready was suspended from practice Miss Taggart says about 1909 she went into the

roofing business, in which her brother, J. A. Taggart, was, and still is, engaged; that she employed Ready and paid him a salary and commission whenever he worked; she claims she did quite a business while trading with a Mr. Naylor, until 1912, and that since then her roofing business has been conducted on a much smaller scale. She states she also conducted a company dealing in tax sales certificates of property which she understood was sold by the sheriff, and that Ready managed this business for her; she claims this business was very profitable, and that when Ready and Boyle suggested that she buy Boyle's property, she had about $5,000 cash on hand; this money she did not keep in bank, but kept it in a box which she concealed in the fireplace in her home; from this $5,000 she made the $4,500 payment. In August following she paid $1,200 cash on account of the purchase of the real estate, and in January, 1915, she borrowed $800 from her sister, and with money she claims she had made in the meantime from tax titles, she completed the payment on the real estate by paying the balance of $2,800. Her sister had no bank account, and she also kept her money in the box in the fireplace.

After the sale of the personal and real property, Miss Taggart claims she retained the bond and mortgage and that Ready thereafter always endorsed the interest payments made thereon, as attorney, and that Boyle collected the interest and remained in possession of the house and household goods and the horse and carriages until his death; that Ready had possession of the bill of sale from the sheriff, and the deed from the sheriff and also the deed from Mrs. Deroussen. At the time Miss Taggart bought the bond and mortgage, the principal due thereon was $12,750, and she understood that Boyle and Ready were to have the privilege of collecting $750 of this amount, and that $12,000 was the amount that she was to receive from the property. Miss Taggart and Ready claim that when she consented to buy Boyle's property, she insisted upon two things, viz., that the bond and mortgage should be in her hands when she paid the $4,500, and that she must have a warranty deed for the real estate, as she considered a sheriff's deed worthless. She made no investigation of the properties; she did not ask for a written assignment of the bond and mortgage; and her reason for insisting on a warranty

deed was because she understood the party who gave the deed would have to pay her the $4,000 she paid for the property, if anything happened; she did not make any investigation of Mrs. Deroussen's financial responsibility when she agreed to take the warranty deed from her. When she paid the $4,500, Ready turned his back on the deputy sheriff and divided the money between himself and Boyle, while the sheriff was selling the property.

In the mortgage which Miss Taggart claims she bought is a provision, to the effect that the principal secured thereby should not become due unless and until any dower rights should be paid out of the proceeds thereof.

It also appears that when Miss Taggart claims she engaged in the roofing business, Ready and one Stowell were to engage in the business with her; that they were each to have a one-third interest in the business and a certificate was executed by Harry Stowell, J. A. Taggart and M. J. Ready and filed, in which they assumed "Stowell Paint and Roofing Company" as a trade name. This certificate was typewritten by Miss Taggart, and the acknowledgment written by her for J. A. Taggart states that he has read the foregoing certificate, &c. Ready and Miss Taggart explain this as a typographical error, and say that it does not refer to James A. Taggart, the brother of Miss Taggart, who was then conducting a roofing business under the name of J. A. Taggart, at the same address at which they proposed to do business. As stated, Miss Taggart says she only paid Ready when he worked, and Ready claims that after some months' experience in the business he left it, and went to Bermuda, because Miss Taggart refused to recognize that he was entitled to a one-third interest in the business. Notwithstanding this breach in their relations, Miss Taggart retained absolute confidence in Ready, and because of this confidence, and on his advice and judgment, she made the purchase of Boyle's property. At the time of the sales of the personal and real property Ready, according to his receipts, was acting as attorney for himself, for Mr. Boyle, Miss Taggart and Mrs. Deroussen, and although he knew at the time Miss Taggart was not getting a valid title to the Irvington property, because of the trust in favor of Mrs. Gordon, he did not

disclose this fact to either Miss Taggart, who bought the property, or to Mrs. Deroussen, whom he had induced to give a warranty deed for the property.

Because of the serious nature of the charges made in this action affecting a member of the bar of the state and an officer of this court, I have thought it advisable to recite the principal facts established, in order that a comprehensive view may be had of the situation.

These facts, to my mind, conclusively show that Ready and Miss Taggart, with the assistance of relatives and friends, entered into a conspiracy to defraud Boyle of his property.

The fraud is clear and unmistakable. Ready took advantage of the confidence he had inspired in Boyle—a heavy habitual drinker, a man of "dull intelligence," as Judge Pilgrim describes him, of meagre education—and under the pretence that he was to relieve him of his domestic and property troubles, he induced Boyle to allow Ready to obtain judgment against him for thousands of dollars Boyle did not owe him. Ready went through the form of having a levy made on Boyle's property and a sale thereof to Boyle's niece, Mrs. Deroussen. I am satisfied she, and not Miss Taggart, was the person who bid in the personal and real property. After the levy on the household goods, Ready bethought him of the Traurig bond and mortgage, which the deputy had not included in the list of property attached to the levy; he caused them to be added and then directed the sheriff's deputy not to sell them, as he claimed they had been previously sold at private sale to Miss Taggart. As a matter of form, carrying out the original scheme of Boyle and Ready, the property was sold to Mrs. Deroussen in Boyle's presence, but in Boyle's absence a bill of sale prepared by Ready was given for the balance of the personal property, a month after the sale, by the sheriff to Miss Taggart.

It is significant to note that the deputy, despite Ready's orders, apparently sold everything covered by his levy, including the bond and mortgage, and that the bond and mortgage is not mentioned in the bill of sale which Ready prepared.

After this sale Ready had Boyle examined in supplementary proceedings—for what reason does not appear—as Ready says he was entirely familiar with Boyle's affairs and properties.

There was nothing in the entire transaction to arouse Boyle's suspicion. The judgment was obtained as he agreed it should be: the amount of it was apparently unimportant; his personal and real property was sold and bought in by his niece, Mrs. Deroussen—an object of his bounty, and to whom by his will he left half of his estate; his enjoyment of his property was uninterrupted; he collected the interest on his mortgage from Traurig; he occupied his home, drove his horse and was lulled into the belief that Ready, his attorney and companion, had straightened out his affairs in a satisfactory manner. At or shortly before the time Ready sued him, Ready had paid back to Boyle money he had advanced to enable Ready to adjust matters for him or to pay Ready for services he was to perform. Boyle was not called upon to execute an assignment of the bond and mortgage or a deed for the Irvington property. His troubles with his wife had been settled two years before. The only matters he had to worry him was the title to the Market street and Irvington properties, which were held in trust and which apparently Ready had cleared up by his judgment and the sheriff's sales, although as a matter of fact he had not done so; the insurance covering the mortgage and that covering the Irvington property was not changed; Mrs. Deroussen, after buying in the property, had not interfered with him in any way, and had executed a deed at his request, which Ready prepared, which for all Boyle knew had conveyed this property to him; this deed was carefully kept off the record until after Boyle's death, and Boyle died, evidently believing he was the owner of all the properties over which he had exercised ownership while living.

I am satisfied Miss Taggart never saved from her work as a clerk and in the roofing business and the tax sale business and had on hand $5,000 or $7,000, or any such sum. In fact, I doubt if she were ever in the roofing business, or in the tax certificate business. The initials of her brother's name are similar to her own; admittedly, he was, and still is, engaged in the roofing business in a very small way, and it would appear from the form of the acknowledgment to the certificate that he, and not she, was the J. A. Taggart referred to therein. But if it be considered that she was in this business between 1909 and 1912, then the

profits therefrom, according to the certificate on file, were to be divided among herself, Ready and Stowell; and it appears from Naylor's books, the dealer with whom they traded, that she never bought any material, and that in 1910 Ready bought about $262 worth of material, and that in 1911 he bought about $165 worth, which certainly indicate that no great profit was made by either of them from the roofing business. Furthermore, I am not convinced that either Miss Taggart or her sister ever had the sums of money they claim to have invested in Boyle's property; they were both too impertinent and evasive when examined on this point, and, in addition, they both appear to be too intelligent to place the savings of sixteen years in any investment without some investigation. Miss Taggart claims she expected to realize at least $12,000 from the Traurig mortgage which she was buying for $4,500, and yet the mortgage by its express terms informed her that she would not receive one dollar of this sum until all claims for dower in the property covered by the mortgage had been paid from the principal sum secured thereby. She made no inquiry about Mrs. Boyle's dower rights at the time she claims to have bought the mortgage, and was not informed that they had been released; there is nothing in the record to show that she knew that Mrs. Boyle's claim had been settled; she wishes it believed that she invested her life's savings in Boyle's property on representations made by Ready and Boyle, without such investigation, and without a written assignment of the bond and mortgage from Boyle to herself, although Boyle and Ready had promised her a written assignment as soon as she had paid the purchase price; and although she knew according to her statement that Ready was having Boyle's property sold by the sheriff in order that Boyle and Ready could raise some money, she was content to take receipts from Ready, as attorney for an unnamed client, and never asked Boyle to give or sign a receipt. During the period between June, 1914, and January, 1915, she managed, she claims, to have accumulated about $2,000 from her profits on tax certificate sales, but she is unable to name a single such transaction from which she derived a profit; and Ready, who she says managed this tax sale business for her, is silent on the subject.

Another significant circumstance is that, like Ready, she has no books from which information about her business and the extent of it can be obtained; she never had a bank account, and whatever books she kept are incomplete, or are lost; all her transactions appear to be cash ones, and the entire absence of checks, vouchers or receipts, except receipts from Ready, warrants the conclusion that her extensive business and the profits made therefrom are purely fictitious. Miss Taggart shows her ignorance of the tax certificate sale business which she says Ready has largely managed for her since 1910, when she states that the business consists in dealing in tax certificates for properties that are sold by the sheriff when people don't pay their taxes. With this display of ignorance on her part, I am unable to believe that she ever invested in the course of any year $1,000 in such certificates, as she claims to have done, or even made the profits from this business which she claims.

Consideration of the reasons given by Ready for obtaining the judgment against Boyle only goes to confirm the impression that Ready's conduct was fraudulent throughout. His contention that Boyle was indebted to him, on an agreement for the amount of the judgment, is shown to be false; his failure to explain why he repaid money to Boyle at the time he claimed Boyle owed him thousands, demonstrates this; furthermore, his claim that the judgment was obtained and the sales of the properties held for the purpose of enabling him and Boyle to obtain money they both badly needed, is not borne out by the results. When Miss Taggart, as she claims, paid Ready on Boyle's account $8,500, with this money in hand and his necessities pressing him, Ready only retained $2,000 and turned $6,500 over to Boyle. This $6,500 was not paid in one sum. From the first payment of $4,500, in June, 1914, Ready says he retained the $2,000; when $1,200 more was paid, in August, on account of the Irvington property, Ready deducted nothing from this amount, and claims he paid it over to Boyle; and, again, on January 2d, 1915, when it is claimed Miss Taggart paid Ready the balance of $2,800, he deducted nothing therefrom, but turned the entire amount over to Boyle. If Ready's necessities were so great in May, 1914, that he had to have money and was obliged to sue Boyle in order

to obtain what he claimed was owing him, I cannot understand why Ready did not get more of the money which it is claimed Miss Taggart paid for Boyle's property, particularly as Ready knew that all of Boyle's property out of which his judgment could be satisfied was being sold to Miss Taggart for less than half what it was worth, except the trust property on Market street, and when he felt that he could not proceed against this property because of an unexecuted trust in favor of his nephew, which he says Boyle created therein. Not only did Ready fail to press the collection of the judgment on which he was anxious to obtain his money, at the times mentioned, but he waited for nearly ten months after the first payment and until after Mr. Boyle's death before he did anything more to realize on his judgment; and then, in March, 1916, he sold the judgment to the defendant Kenyon; without informing Kenyon of the nature, extent or condition of Boyle's property, and without telling Kenyon how the judgment could be collected, he induced Kenyon to buy the balance of his judgment against Boyle for $5,000. Kenyon, without question or investigation, agreed to buy the judgment and to pay $5,000 therefor, and he took an assignment of it in which the consideration was expressed as $5,000; he claims he then paid Ready $500 on account and was to pay the balance in sixty days. Like Miss Taggart, Kenyon distrusts banks, and he says he had this $500 in cash in his safe and paid it to Ready, taking no receipt therefor, being satisfied with the assignment of the judgment which he handed back to Ready to have recorded.

If Ready had honestly obtained this judgment for money actually owing him, and of which he was in need, I do not understand and could not obtain from him any satisfactory explanation to show why he did not retain more of the money which he claims Miss Taggart paid Boyle, through him, to apply on the judgment; nor could I learn why he did not proceed in a regular, orderly way to collect the amount of the judgment from Boyle's property which was amply sufficient for the purpose.

Possibly, the explanation, if given, would also explain why Boyle's bank accounts, of which he had three or more, do not show the deposit of moneys therein about the times or in any-

thing like the amounts which Ready and Miss Taggart say were paid him.

My conclusion is that Ready and Miss Taggart have perpetrated a fraud upon Mr. Boyle and upon his estate; that the judgment obtained by Ready with Boyle's consent, for the purpose of adjusting Boyle's affairs, and the sheriff's sales thereunder, have been fraudulently used by Ready and Miss Taggart to obtain possession of Boyle's property. I find that Boyle was not indebted to Ready for any amount at the time the judgment was obtained, and that any judgment Ready obtained therefor and claims the benefit of was fraudulently obtained, and that Boyle's defence thereto was lost through his ignorance and Ready's fraudulent conduct.

I also find that Miss Taggart did not buy Boyle's real or personal property, or the bond and mortgage, or any or all of them, and that she did not pay $8,500, or any other sum therefor.

I also find that Kenyon was not a *bona fide* purchaser and assignee of Ready's judgment. I am not convinced that he ever paid or agreed to pay Ready $5,000, or any other sum therefor, or that he ever paid Ready $500, or any other sum, on account thereof.

Because of the parties involved, and the peculiar nature of the case, I have permitted the defendants to testify to transactions with Mr. Boyle in his lifetime, believing, if fraud existed, the facts could be best ascertained by giving Mr. Ready and Miss Taggart all the opportunity they asked to present their version of the matter. And I am convinced very largely by their own testimony that they are guilty of the fraud charged against them, and a decree will be advised that the judgment should be set aside, and the sheriff's sales thereunder be declared void, and that Miss Taggart be directed to return and reconvey all of the properties she obtained thereunder, and that the money paid into court by the complainants Marcus D. Traurig and others, as mortgagors, be paid to the defendant Harry Clayton Povey, as executor of the last will and testament of John Boyle, deceased, and that the bond and mortgage of said complainants to said John Boyle be, on such payment being made, surrendered to the complainants for cancellation.