MILTON J. GORDON, complainant,

*v.*

JOSEPH L. SCHELLHORN, defendant.

[Submitted January 25th, 1924. Decided January 29th, 1924.]

1. If either party to a contract conceals some fact which is material and which is within his own knowledge, and which it is his duty to disclose, he is guilty of actual fraud.

2. Where a vendor promised a vendee, in consideration of his purchasing certain machinery and paying therefor, a lease of the premises on which the machinery was erected, and knew at the time that his ability to comply with his promise depended upon his being able to satisfy the demands of the owner of the premises, and, as a reasonable man, knew that the vendee would not purchase the machinery at so high a price, or at all, without the lease, and failed to disclose the condition upon which he could make such compliance, he was guilty of fraudulent conduct such as may be relieved against in this court.

3. Where a vendor advertised certain machinery for sale with a lease, and also in a circular letter stated that the goods were to be sold "with lease of light factory and living apartment" and in dealing with a proposed vendee showed him a draft (unexecuted) of a lease for three years with an option to purchase, whereupon the vendee communicated with the owner of the premises, who refused to execute a lease to vendee, saying he would let the premises to the vendor only, but stated that he had no objections to the vendee as a sub-tenant; whereupon, at the time of passing title the vendee refused to proceed until given some assurance as to the lease, and the vendor gave the vendee a letter agreeing to sublet to him the premises in question, but stating therein that "the lease has not yet been signed" it is clear that the vendor represented that he would assign a valuable lease to the purchaser of his chattels, and he cannot be heard to deny that he intended to put the vendee in the very state of mind that induced him to enter into the contract to purchase the chattels.

On bill, &c.

*Messrs. O'Brien & Tartalsky,* by *Mr. Samuel Tartalsky* (*Mr. Maximilian T. Rosenberg,* of counsel), for the complainant.

*Messrs. Perkins & Drewen,* by *Mr. Randolph Perkins,* for the defendant.

BENTLEY, V. C.

This is a bill to rescind a contract for the sale of machinery and cancellation of a chattel mortgage and series of notes given in payment therefor.

The complainant is engaged in the embroidery business. The defendant and his brother, Fred Schellhorn, are engaged in the real estate and insurance business, and they are, for the purposes of this suit, one and the same individual. By that I mean that while the legal title to the machinery in-

volved in this case was in the defendant, his brother, Fred,
as his attorney in fact, carried on all of the negotiations, the
defendant, I think, doing nothing more than to execute the
bill of sale, to be mentioned hereafter, and also affix his name
to an important letter of March 19th, 1923, so that I shall,
for the sake of convenience, refer to both of these brothers
as "the defendant," it being elementary that, in equity, the
defendant is bound by the acts of his agent even to the
extent of charging the former with fraud perpetrated by the
latter. *Nicholson* v. *Janeway, 16 N. J. Eq. 285.*

Prior to the dealings of the parties that led to this suit,
the defendant caused an advertisement to be published, which
came to the attention of the complainant, holding out for
sale, *with a lease,* the chattels which the latter subsequently
bought. The complainant also came into possession of a
circular letter, typed upon the stationery of Schellhorn
Brothers, an artificial person composed of the defendant and
his brother. That letter reads as follows:

"WEEHAWKEN, N. J., November 23d, 1922.
Dear Sirs:
I offer for sale a complete embroidery plant, consisting of the
following:
Three 15-yard automatic embroidery machines, Sauer system;
One punching machine;
Six sewing and mending machines;
Two bobbin machines;
With motors, tables, shafting, belting, &c., in perfect condition,
will be sold at a sacrifice, on easy terms, together or separately,
*with lease of light factory and living apartment.*
For further particulars apply Fred. R. Schellhorn, No. 107 Shippen
street, Weehawken Heights, N. J. Phone 249 Union.
Yours very truly,
FRED. R. SCHELLHORN."

(The italics are mine.) The parties subsequently met and
discussed the purchase of the property just enumerated and,
as a result of their conferences, the defendant was beaten
down from the sum of $18,000, which he originally asked,
to the sum of $10,500, which price was agreed upon. There-
upon, they met at the office of a lawyer mutually agreed
upon and with whom each of the parties had previously had

relations as a client. There, on the 10th day of March, 1923, an agreement was made wherein it was alleged that the defendant was the owner of the chattels to be sold, and agreed that the complainant should buy the same from the defendant for the sum of $10,500, $200 whereof was paid upon the signing of the contract, $1,900 to be paid on the delivery of the bill of sale, and the balance of $8,400 to be taken care of by a series of notes, each in the sum of $400, the first one becoming due May 15th, 1923, and the others falling due one each month thereafter, with certain inconsequential notations. It was also set out that the contract was to be consummated on or before March 17th, 1923, with possession in the vendee immediately, and a provision that if the contract should not be carried out the purchaser was to redeliver the property and secure back his deposit of $200 without further claim by either party against the other. On the following Friday, March 16th, the time fixed for the passing of title, a delay was caused by reason of a claim made by a family named Neir, who were in possession of the living apartment referred to in the circular letter copied above. This matter was satisfactorily adjusted between the Neirs and the defendant, and the matter of passing title went over to the following day, March 17th. At that time the complainant, who has been a member of the bar of some other jurisdiction, refused to accept a bill of sale signed only by the defendant's brother as attorney in fact, and insisted upon the signature of the defendant in whom the title stood as well. That evening, namely, Saturday, the defendant or his brother tendered the bill of sale with the defendant's signature thereon, but the complainant, for some reason or no reason, refused to do business at that time and the matter again went over until Monday morning, March 19th. On the last-mentioned date the defendant again attended at the office of the aforesaid lawyer, but the complainant was late and there appears to have been considerable effort to reach him by telephone and some anxiety about his absence, until he eventually also came to the office where the contract was to be consummated. Up to this point, and with the exception

of one exceedingly important matter to be subsequently explained, there appears to be no serious difference as to what had transpired. After meeting on the morning of the 19th, delivery was made of the bill of sale by the defendant and delivery by the complainant of the series of notes mentioned, secured by a chattel mortgage, but before the separation of the parties—and it is impossible for me to say whether it was before or after these deliveries were negotiated—the complainant raised the question of his securing a lease upon the freehold where the chattels purchased by him were situated. The negotiations and representations made by the defendant as to this lease are the important feature which I have just mentioned.

It will be recalled that the defendant, both in his advertisement in some magazine and also a circular letter hereinabove copied, had advertised that there should go with the chattels a lease of the premises where they were situated. At the inception of the dealings with the parties one with another, the complainant had taken this matter up and was not only promised a lease, but was shown a draft thereof ready for execution but not executed, for a term of three years, with an option to purchase, for the benefit of the proposed lessee, and it was thereupon represented by the defendant that he would execute an assignment of that lease covering the premises mentioned. The complainant thereupon telephoned to Mr. Hollander, who purported to be the owner and in whom the legal title resided, and asked him if he could have a lease of the premises if he should purchase the fixtures, whereupon he was informed by Mr. Hollander that he could not, that the said Hollander's business was with the defendant, and that he would not make a lease to the complainant; although, in answer to the complainant's question, he said that he had no objection to the latter as a subtenant. Now, it appears that previously these premises had been rented by Hollander to a firm named Squire & Tobias, which had been declared a bankrupt and against which there was a claim by the landlord for arrears of rent. In the fall preceding the negotiations I have men-

tioned, the Schellhorns had foreclosed a chattel mortgage upon the machinery described above, and it was at their sale that the defendant secured title thereto. At the sale under the chattel mortgage Mr. Hollander distinctly warned all bidders that he would refuse to rent the premises unless he was paid the arrears of rent owed by Squire & Tobias. It is clear to me from the testimony that the defendant heard that announcement.

After the passing of the title on March 19th, namely, on the 20th of that month, the complainant and the defendant had an interview with Mr. Hollander, and then the complainant learned that Mr. Hollander had not executed the lease because he was demanding of the defendant $2,250, representing the arrears of rent of Squire & Tobias. It is undoubtedly true that Hollander was attempting to drive a hard bargain, and subsequently he or his principal, in trust for whom he held the title of the property, agreed to accept a much lower sum, finally getting down to $800. To this the defendant refused to accede. There has been a great deal of testimony injected into the record anent the exorbitance of Mr. Hollander's demand and the lack of legal liability on the part of the defendant. As indicated on the argument, I am unable to see the force to be given to this evidence that the defendant contends for.

At the time of the passing of title and when the complainant made objection that he was not secured as to the lease of the realty—and this, it will be remembered, was prior to his meeting Hollander and the defendant—the following letter was written and signed:

"HOBOKEN, N. J., March 19th, 1923.

Mr. Milton J. Gordon,
  c/o Boulevard Lace and Embroidery Works,
    4932 Boulevard, North Bergen, N. J.
Dear Sir:
  In consideration of the closing of the purchase of the plant at 320 Eighteenth street, West New York, New Jersey, we hereby agree to sublet to you the premises 320 Eighteenth street, West New York, New Jersey, for the term as set forth in the lease and subject to the conditions therein and options thereunder.

The security which has been deposited of $300 is to be applied to the last month of the rent, and you, or your assigns, are to have the benefit of such security.   In other words, the purchase price for the plant includes this cash security.

It is understood, however, that the lease has not yet been signed, and the above letter is given upon the assumption that the lease will be signed in the future.

Very truly yours,

SCHELLHORN BROTHERS, INC.,

By F. R. Schellhorn,

*Secretary and Treasurer.*

JOSEPH L. SCHELLHORN."

The history of this document discloses that the first two paragraphs were dictated to a stenographer by the complainant, and the last paragraph by a lawyer named B. C. Moore, who was acting for both parties in closing the contract. Taken by itself, the meaning and effect of this memorandum is not entirely free from difficulty.   The complainant contends, of course, that the gist of his agreement with the defendant is contained in and expressed by the portion of the letter that he dictated and that the remaining paragraph was simply added by Mr. Moore out of an abundance of caution or merely for the purpose of saying something.   The defendant, equally, of course, maintains that the first paragraph is to be entirely disregarded, and that the real reason for the letter was the securing to complainant the benefit of the $300 deposit, and that the third paragraph was tantamount to an agreement by the defendant that he would assign *if,* and when, he should secure a lease, and that he was to be exonerated if that event should not occur.   As I say, taken by itself, the meaning to be given to the letter is obscure, but when read in the light of all the circumstances surrounding the case, I think it must be said that the defendant held out to the complainant the promise of a lease, and that the complainant was largely actuated in purchasing by a reliance upon the representation that a lease would be given.   It is clear that the value of the machinery would have been very little unless the owner was secured by a demise of the premises where it was located.   The testimony has been that the machinery is of a most delicate kind and requires

to be set up upon special concrete foundations extending well down into the subsoil, so that it is apparent that to tear this machinery out and transport it to another location and there build the necessary foundations and install the machinery upon it would be so expensive as to reduce the value of the same, which was second-hand, to almost that of scrap metal. In this connection it is significant, that although the defendant originally asked $18,000 and eventually secured $10,500, it has been represented to the court during the progress of the cause that the defendant has secured a purchaser from whom it is *hoped* that the same machinery, in the same condition that it was in March, 1923, may be sold for as much as $5,000. Furthermore, it is impossible for me to shut my eyes to the wide circulation given by the defendant to the assertion that there would be included in the sale a lease of the premises. With these facts are to be considered others, to which I have referred, that make it clear that the defendant did represent that he would assign a valuable lease of the premises to the complainant, in part consideration of the latter's money and notes. For example, there are the advertisement published that a lease would accompany the chattels and a circular letter sent out to like effect, as well as the conversation when the transaction was first discussed and when the complainant was not only told that a lease, a draft of which was shown him, would go with the machinery; but was permitted, in the defendant's presence, to telephone the landlord, from whom he learned nothing of the conditions, but was told that a lease would be made only with the defendant. When Schellhorn, by his acts and words in that respect, and his silence upon the condition upon which he could secure a lease, allowed Gordon to draw the perfectly justifiable conclusion that he was securing possession of a plant that could be worked, he certainly cannot be heard to deny that he intended to put the complainant in the very state of mind that induced him to enter into the contract. There is no doubt in my mind that he was entirely honest when he so represented the facts. But his honesty is not in issue. All the authorities agree, that while moral turpitude

may be, it is not essentially an element in fraud. And it is clear that he had some sort of an understanding with the landlord which had even progressed so far as to reduce the terms of the proposed lease to writing, and I think that he regarded the matter as hinging entirely upon a composition with Mr. Hollander of his claim for back rent. I have already indicated during the argument, and I now reiterate, that whether it be called constructive fraud or by any other name (and it is unnecessary to go into an extended discussion of the subject to be found in *1 Big. Fraud 10* and *passim*) there was no conscious determination upon the part of the defendant to secure the money and negotiable paper of the complainant upon a misstatement of facts or any false representations. I do think, however, that he did promise, as a part of this arrangement, that he would place the complainant in possession of the premises protected by an assignment of lease, and that in this he took a chance. Bearing in mind the fact of his representations to which I just alluded, it seems clear to me that when it came to the passing of title of the machinery on March 19th the complainant, finding himself upon the point of forever barring himself from any complaint in the premises, demanded some security that he would be put in possession of the realty where that machinery was located and refused to consummate the transaction unless he was secured, and that it was then worked out by one or the other, or all of the persons present, that the letter of March 19th should be given to him, and that explains the opening phrase thereof: "In consideration of the closing of the purchase of the plant." I do not know, nor is it necessary for me to decide, whether or not Mr. Moore was entirely ingenuous when he dictated the concluding paragraph and simply used an unfortunate conglomeration of words that failed to shed any additional light upon the subject, or, rather, obscured the matter. But he succeeded in using language over which a great deal of argument has been necessary, and, principally, by reason of his use of the word "assumption." The Standard Dictionary defines "assumption" as "a taking for granted." Therefore, the language in the last

paragraph—"and the above letter is given upon the assumption that the lease will be signed in the future"—means that it was taken for granted or conceded that there would be a lease. It has been argued that 'the draftsman meant that the letter· was given upon the *condition* that the lease would be signed; but the difficulty is, as was expressed by Vice-Chancellor Backes in *Messinger* v. *Franzblau, 118 Atl. Rep. 260:* "If that had been the case it would have been a simple matter to have said so." To summarize, the defendant, by his written and oral representations, led the complainant to believe that he was paying for a lease as well as the tangible chattels, and finding that without the former the complainant would not complete the sale he bound himself to secure and assign a lease from Hollander. The lease was part and parcel of the arrangement between them, and· every effort has been made by the defendant to live up to this part of his obligation, even to the extent of commencing suit for specific performance against Hollander to compel him to execute and deliver such a lease, except the purchase from Hollander which constitutes his breach of contract.

Objection is made by the defendant that this suit is founded upon an attempt to vary the terms of a written instrument by parol. It is true that the parol agreement was made contemporaneously with the main contract and ordinarily would become merged therein (*Parker* v. *Jameson, 32 N. J. Eq. 223; Scharff Construction Co.* v. *Bower, 81 N. J. Eq. 198*); but it is equally true that fraud, among other things, creates an exception to the parol evidence rule. *Pom. Eq. Jur. (4th ed.)* § *858.* In the leading case of *Naumberg* v. *Young, 44 N. J. Law 331,* the exception with which I am now dealing was distinctly set out at pages 334 and 335. The court says:

"Neither in the declaration nor on the evidence do the plaintiffs rely on fraud—false and fraudulent representations by the defendants, whereby they were induced to enter into the lease—as a ground for recovering damages. The grava-. men of the suit is a warranty or undertaking by the defendants that the engine and boiler were in good repair and

capable of supplying the power necessary to carry on the plaintiffs' business.

\*     \*     \*     \*     \*     \*     \*     \*     \*

"Except where fraud or illegality has been set up, parol evidence of an agreement not expressed in the writing is competent only where the writing contains only a part of the contract, or the evidence is admitted to apply the written contract to its subject-matter, or to establish a parol contemporaneous agreement between the parties, with respect to the manner in which the rent reserved should be paid, which both parties have acted upon and carried into execution, and, therefore, have given the agreement the force and effect of an accord executed."

Of course, the exception to the rule mentioned in this quotation that is of interest now is the first one, namely, fraud.

But the defendant says there was no element of fraud under which to invoke the exception. It is true, as I have already said, that I do not think there was any conscious attempt to actually deceive the complainant by an untruthful statement of fact; but there was that sort of fraud that grows out of the suppression of a fact known to the party to be charged when the one with whom he deals, justifiedly relying upon the representations of the former being true and complete, parts with something of value or puts himself in a worse position than he would have occupied had the complete information been communicated. Professor Pomeroy, in his work on *Equity Jurisprudence,* says that actual fraud may be reduced to two forms, namely, false representation and fraudulent concealment (section 875), and it is frequently a matter of delicacy to apply the principles in cases founded upon the latter sort. In line with what I have said about the lack of any moral turpitude existing in this case, I cannot do better than to quote the same author, in section 873, when he says that although the omission on the part of the defendant . should be willful "it is not essential in the equitable notion, although it is in the legal, that there should be a knowledge of and an intention to obtain the undue advantage which

results." He also points out (section 877) that a representation concerning something in the future may be fraudulent where it is affirmed as a fact quite as well as if made of a fact existing at present. In the case of *Roberts* v. *James, 83 N. J. Law 492,* it was represented, on the sale of land, that there would be a hotel near by, a railroad station, cement walks and a park with swings, none of which ever made their appearance. On an action by the vendor for the purchase price the vendee defended upon the ground of fraud in these representations—all concerning things to be done in the then future. The court of errors and appeals in that case says:

"It is, however, settled that the representation of an intention as existing may, if false, void the contract induced thereby."

It is true that this is placed upon the ground that no such intention was in the vendor's mind at the time he so informed the purchaser. But just so here: My difficulty with the defendant's case is that there was present in his mind an intention to assign a lease *only* if he were able to secure one from the owner of the realty, but said, unequivocally, that a lease was to go with the machinery, and concealed from the complainant his state of mind, namely, the contingency or condition under which the lease would be made by Hollander. Pomeroy says, in section 901, that:

"If either party to a transaction conceals some fact which is material, which is within his own knowledge, *and which it is his duty to disclose,* he is guilty of actual fraud."

This quotation appears in *Keen* v. *James, 39 N. J. Eq. 527* (at *p. 540*), where Mr. Justice Dixon adopts it for the court. The difficulty, of course, in most cases arises in determining whether or not any such duty exists. The same author, in reducing the cases to the classes in which the duty to disclose exists, says:

"The second class embraces those instances in which there is no existing special fiduciary relation between the parties, and the transaction is not in its essential nature fiduciary, but it appears that either one or each of the parties, in entering into the contract or other transaction, *expressly* reposes a

trust and confidence in the other; or else from the circumstances of the case, the nature of their dealings, or their position towards each other, such a trust and confidence in the particular case is *necessarily* implied. The nature of the transaction is not the test in this class. Each case must depend upon its own circumstances. The trust and confidence, and the consequent duty to disclose, may expressly appear by the very language of the parties, or they may be necessarily implied from their acts and other circumstances."

In the case of *Ricketts* v. *Tompkins, 73 N. J. Eq. 552,* a bill was filed to set aside a deed made by the complainant to the defendant. A decedent had left a paper-writing, ineffectual as a will, attempting to devise and bequeath all her estate to the defendant. Because of the ineffectiveness of this document the complainant had taken, by descent, a valuable interest in some real property. The latter testified that the defendant told her that the decedent had made him the beneficiary of her will, but that there was a slight technicality which would necessitate the complainant's signature in order to obtain title insurance. Thereupon, complainant executed a conveyance, and it was held that she was entitled to a decree canceling the same. Here, of course, there was a misrepresentation, but the actual fraud consisted in his not informing her of the fact that the inartificiality of the paper robbed it of all legal effect and gave her an interest in the land when she relied upon his statement.

It is of no moment how true all other statements in a transaction may have been if a misrepresentation or concealment is made of any material matter, where a duty to disclose exists. *Pom. Eq. Jur.* § *880.* In the case of *Nash* v. *Minnesota, &c., Co., 163 Mass. 574,* an action for deceit governed, of course, by legal and not equitable principles, it was decided by a majority of the court that the defendant may show that his words were not used with the intention to state anything falsely, and explain what his understanding and intention were. On that phase of the case only, Mr. Justice Holmes filed a dissenting opinion, in part as follows:

"When a man makes such a representation, he knows that others will understand his words according to their usual and proper meaning, and not by the accident of what he happens to have in his head, and it seems to me one of the first principles of social intercourse that he is bound at his peril to know what that meaning is. In this respect it seems to me that there is no difference between the law of fraud and that of torts, or of contract or estoppel  *  *  *. Of course, if the words used are technical, or have a peculiar meaning in the place where they were used, this can be shown, if by the context or the subject-matter or the circumstances the customary meaning of the words is modified, this can be shown by proof of the circumstances,· the subject-matter, and the contract; but when none of these things appear, a defendant cannot be heard to say that for some reason he had in his mind and intended to express by the words something different from what the words appear to mean and were understood by the plaintiffs to mean, and are interpreted by the court to mean, whether the action be in tort or contract."

An illuminating discussion of the attitude of a court of equity appears in the case of *Reynel* v. *Sprye, 1 Le G. M. & Co. 660.* Lord Cranworth says:

"Once make out that there has been anything like deception, and no contract resting in any degree on that foundation can stand. It is impossible to so analyze the operations of the human mind as to be able to say how far any particular representation may have led to the formation of any particular resolution, or the adoption of any particular line of conduct. No one can do this with certainty even as to himself, still less as to another. Where certain statements have been made, *all in their nature capable, more or less, of leading the party to whom they are addressed to adopt a particular line of conduct,* it is impossible to say of any one such representation so made, that even if it had not been made, the same resolution would have been taken, or the same conduct followed. Where, therefore, in a negotiation between two parties, one of them induces the other to contract on the faith of the representations made to him, any one of which has been un-

true, the whole contract is considered in this court as having been obtained fraudulently. Who can say that the untrue statement may not have been precisely that which turned the scale in the mind of the party to whom it was addressed? The case is not at all varied by the circumstances that the untrue representation, or any of the untrue representations, may in the first intance have been the result of innocent error. If, after the error has been discovered, the party who has innocently made the incorrect representation, suffers the other party to continue in error, and to act on the belief that no mistake has been made, this, from the time of the discovery, becomes, in the contemplation of this court, a fraudulent misrepresentation, even though it was not so originally.. These are all principles of such obvious justice as to require neither argument nor authority to illustrate and enforce them, and they need but to be stated, in order to command immediate assent. The only question can be in each particular case, how far the facts bring it within the principle."

In the instant case, it seems to me inevitable that when the defendant promised the complainant, in consideration of his purchasing the machinery and paying therefor, a lease of the premises, and knew at the time that his ability to comply with his promise depended upon his being able to satisfy the demands of Hollander, and as a reasonable man knew that the complainant would not purchase the machinery at so high a price, or at all, without the lease, and failed to disclose the condition upon which he could make such compliance, he was, under the authorities that I have referred to, guilty of fraudulent conduct such as this court will relieve against. Because, in the nature of things, he was getting a larger price than Gordon was willing to pay for the machines in the event that the lease could not be secured—a most inequitable contract to hold Gordon to, when, in fact, the lease was not to be had. He was the one who had knowledge of the facts suppressed, whereas the defendant relied upon his statement that the lease would be forthcoming. This confidence immediately created a corresponding duty in the defendant to disclose all of the facts and circumstances connected therewith of which he had knowl-

edge. If this court is to maintain its boast of being one of conscience and fair-dealing, I do not see how any other conclusion can be reached.

The next contention raised against the bill is that the promise to secure and assign a lease was an agreement to grant an interest in lands and is void under the statute of frauds. This might be so (*Gay v. Mooney, 67 N. J. Law 27*, and *Cooper v. Aiello, 93 N. J. Law 336*) were it not for the fact that the exception to take the case out of the statute referred to in those cases, is made to appear by the written memorandum of · March 19th, under the construction I have already given it.

The next point raised by the defendant is, that there was no consideration for the agreement, as expressed in the letter of March 19th. Counsel says:

"No consideration moved from Gordon to Schellhorn by virtue of which the letter of March 19th becomes a binding agreement. It is true that Gordon in dictating the letter stated 'In consideration of closing the purchase, &c.' But he was under contractual obligation to close the purchase of the machinery. There was clearly no consideration, but merely the recital of one, for the purchase was closed by virtue of the agreement of March 10th.

The case of *Norton v. Abbott, 113 N. Y. Supp. 669*, is almost exactly like the one here."

The fallacy of this argument, of course, is that counsel assumes that the contract between the parties was complete upon the passing of title to the tangible property and leaves out of consideration the further term of the consideration that drew the complainant into the deal, namely, the assignment of lease. It is true that if such an assignment had not previously been contracted for, the letter of March 19th, so far as it referred thereto, would have been *nudum pactum*. But, being convinced, as I am, that at all times, due to the representation of the defendant, the complainant had such a lease in mind, the citations of *Conover v. Stillwell, 34 N. J. Law 54; Snyder v. Merchants' Insurance Co., 59 N. J. Law 69; Watts v. Frenche, 19 N. J. Eq. 407,* and *13 Corp. Jur. 353,* are not apposite. Of course, it is elementary, as therein

pointed out, that a consideration for one contract will not support a distinct and independent contract; but there can be no doubt that the complainant was justified in refusing to fulfill his part of the contract until the defendant completely fulfilled his. The consideration passing from the complainant was the complete execution of his part of the contract, while a portion of the defendant's remained executory, to wit, the assignment of lease.

The complainant went into possession March 10th, relied upon the defendant to secure a lease and assign same to him, and appears to have waited until August 16th before filing his bill to rescind the contract. He did, however, charge the defendant in a letter of April 2d with not having procured the lease and asking how soon he could have the same, and, finally, on July 20th, approximately four months after going into possession, wrote another letter, in which he says:

"Now I have given you plenty of time to get for me the lease. Now I want my money back and am ready to give you back the plant. I decided to annual (*sic*) the deal I am tired of you and your methods I want to hear from you how you want to arrange this transfer of the plant back to you."

This cannot be said to be laches. No harm could have come therefrom to the defendant during that period. It does not seem to me that four months was an unreasonable length of time for him to wait so that defendant could secure a lease from Mr. Hollander. This period of delay in itself was not unreasonable, in view of the fact that it did not operate to injure the defendant in any way.

It also objected on the part of the defendant that there was no mutuality. It seems to me too clear for argument that completer mutuality from the standpoint of the defendant could not be conceived. The complainant had done everything incumbent upon him to execute the contract. He had paid the price. Complete performance on the part of the complainant is not the only method of curing lack of mutuality at the inception of the contract; but there is none more certain.

If a contract, although not originally binding for want of mutuality, is nevertheless executed by the party not originally bound, so that the party asserting the mutuality of the contract has actually received the benefit contracted for, the latter will be estopped from refusing performance on his part on the ground that the contract was not originally binding on the other, who has performed. *6 R. C. L. 690; Green* v. *Richards, 23 N. J. Eq. 32; Reynolds* v. *O'Neil, 26 N. J. Eq. 223; Brown* v. *Pinniger, 81 N. J. Eq. 229.*

If I purchase a hat, to be delivered, *and pay for it,* and, subsequently, I sue to recover back the purchase price because it never has been delivered, it would be a novel defense that the hatter could keep my money because I might have refused to accept the hat if it ever had been delivered.

I will advise a decree of rescission, together with a cancellation of the bill of sale, chattel mortgage, and promissory notes, and that an accounting be taken between the parties.