The hearing of this cause extended over a long period of time. The record covers volumes of testimony, and there is a mass of exhibits.
The amended bill of complaint seeks to set aside an option agreement (Exhibit C-6) given April 1st, 1925, by the complainant *Page 441 
to the defendant, her brother (who then was and still is a member of the New York bar), and the subsequent sale of the subject-matter of the option by the complainant to the defendant in June, 1928 (Exhibit C-7). The option and sale affected the controlling interest of stock in the Autographic Register Company of Hoboken, New Jersey (hereinafter referred to as the American Company), and the Autographic Register Systems, Ltd., a Canadian corporation (hereinafter referred to as the Canadian Company). The complainant acquired the control through a testamentary gift from her husband on his death on July 4th, 1923. The bill asks for a reconveyance and an accounting.
A trust is sought to be impressed upon the stock of the Canadian Company, which the defendant acquired from a former executive of the Canadian Company, a man named Pierce, upon an allegation that the money paid for it was the complainant's; and an accounting and other relief is prayed for.
The complainant charges that the defendant acquired title to her corporate interests through fraudulent manipulations and a "juggling" of her assets, at a time while there existed between them a fiduciary relationship of attorney and client, and that also of trust and confidence engendered by the ties of blood. Under the pressure of those influences, to which is coupled an attitude of misrepresentation and concealment of material facts, complainant says the defendant obtained her interests in the aforementioned organizations.
The substance of the complainant's allegations, as well as the existence of the alleged fiduciary and confidential relationship are specifically denied by the defendant.
On or before July 4th, 1923, the complainant's husband, Walter C. Shoup, was the owner of 358 shares of common "A" stock of the American Company, and also two other shares which were registered in the names of employees, Brenn and Miss Muller, for qualifying purposes.
Complainant on or before July 4th, 1923, held 62 shares of the common "A" stock of the American Company. There were 569 1/2 shares of common "A" stock outstanding. The aggregate holdings of complainant and her husband amounted *Page 442 
to 422 shares of the common "A" stock. The common "A" stock had voting rights and it controlled as long as the dividends accruing under the preferred stock were paid.
The American Company manufactured and sold autographic registers and printing supplies therefor. The Canadian Company sold registers manufactured by the American Company, but printed the forms used in connection with the registers. This company had 250 shares of preferred stock of the par value of $100, and 2,092 shares of common stock which had been issued and outstanding in the lifetime of Walter C. Shoup. The American Company held 229 shares of the preferred stock and 640 shares of the common stock of the Canadian Company. The decedent held one share of the common stock in his name, while his holding company, The Manifolding Devices Corporation, a Delaware corporation, held 1,200 shares of this common stock, being its sole assets. The remaining shares of the common and preferred stock were held by minority stockholders. These 1,200 shares Shoup, in his lifetime, gave to his wife, the complainant, but did not transfer them on the books.
Walter C. Shoup was the president of both the American and Canadian companies. He actively managed the American Company and received therefor a salary of $25,000 per annum. He also received a yearly salary of $6,000 from the Canadian Company. For eighteen months prior to his death, he suffered from a malignant cancerous ailment. Throughout the period of his illness he was attended by the complainant. He left a last will and testament in which he named his wife, the complainant, his executrix and sole beneficiary. The testamentary bequest of 360 shares of the common "A" stock of the American Company, added to her 62 shares that she had acquired from her husband in his lifetime, gave her a total of 422 shares. The 1,200 shares of the Canadian Company stock, which were registered in the name of The Manifolding Devices Corporation, also became hers under the testament, with an additional share (Certificate No. 18), and two qualifying shares held by J.F. Callaghan and S.H.R. Bush. These testamentary gifts vested in her the control of the two companies. *Page 443 
Her vigil at her husband's bedside during the period of his long illness, developed in the complainant a highly nervous condition and other physical ailments that seriously affected her health. Over the same period of time she had the care of her infant son, Robert, who was a sickly and delicate child for the first nine years of his life. He suffered from weeping eczema, developed a bad asthmatic condition, and had several attacks of pneumonia. From the year 1915 when complainant's mother died, to the year 1925 her two sisters and two brothers died; one brother's death being under very tragic circumstances. All of these family troubles and afflictions made heavy inroads upon the complainant's health and peace of mind. They occasioned a severe mental strain, and physical deterioration, which resulted in what was diagnosed as an "exhausted heart."
Prior to her marriage the complainant was a teacher of music in the grade schools. Her training was along musical, cultural, and educational lines. Her spare moments were largely devoted to church, choir, and musical work. Prior to her husband's death, she had had no business experience; and upon his death she felt the need of help and advice in order to cope with the heavy responsibilities which the control of the two aforesaid corporations imposed upon her. (See Exhibits C-111, page 323,C-112, page 77.)
The two companies have assets in excess of $1,375,000, and their annual sales volume is in excess of $1,350,000.
The complainant testified (page 54) that when her husband died, the defendant visited her in her home in Millburn, New Jersey, and made the necessary arrangements for his funeral; that he then advised that a directors meeting of the American Company be called immediately. That was done and a meeting was held on the day of her husband's funeral, and she then was elected president of the American Company. The defendant then became very much interested in her affairs. He aided in the administration of the decedent's estate (page 55), and helped in the preparation of the estate's inheritance tax returns. (Exhibit C-9.) He actively assisted the complainant in her personal and business matters. She confided in him and trusted him. He reviewed *Page 444 
business affairs and conditions with Pierce, the managing director of the Canadian Company (Exhibit C-204, page 9); and he passed upon inquiries which complainant received from business competitors as to a sale or disposition of her holdings in the American and Canadian companies.
The defendant denied that he had any professional or other interest in his sister's affairs at the time of her husband's death, save the natural interest of a brother in his sister's welfare. He denied that he represented her in the administration of her husband's estate, and claims that David F. Edwards, an attorney, represented her. However, the defendant's denial does not find support in the documentary evidence. His name appears on the inheritance tax return as "attorney or other representative to whom all correspondence should be mailed" and his address is given as "350 Tenth Street, Hoboken, New Jersey," the office of the Autographic Register Company in Hoboken (Exhibit C-9).
Furthermore, the inheritance tax folder (Exhibit C-190) shows that on April 17th, 1924, the defendant wrote the complainant that the 9,500 shares of the Carson River stock, appearing in the list of decedent's assets, were worthless. On June 6th, 1924, he wrote Edwards (Exhibit C-220) about a letter of June 2d 1924, from the Comptroller (part of Exhibit C-190), supplying information for the affidavit requested by the Comptroller. The defendant's name appears on the Comptroller's assessment of July 7th, 1924; and, on July 9th, 1924, he paid the tax assessed. Then on July 10th, 1924, he wrote to the Comptroller inquiring how the tax was computed. His name appears on the waiver issued by the State Inheritance Tax Department on July 11th, 1924 (ExhibitsC-215, C-217, C-218). Exhibit C-218 is a letter from the deputy collector to the defendant, which, in part, reads: "As per your request in letter received from you dated March 30th I will be pleased to go over the matter in regards to the additional tax due from the estate of Mr. W. Shoup."
There was a debt of $1,405.02 due the United States Government for income tax for the year 1918 against the estate, which was handled by the defendant (Exhibit C-224). *Page 445 
See Exhibits C-205, C-206 and C-207, which are communications to the defendant about the origin and nature of a claim of George H. and Annie McNeill Edwards for $10,224, which had been reduced to $8,600 at the time of the death of Walter C. Shoup. The docket of the defendant's law firm (Exhibit C-224) contains entries concerning this matter from October 13th, 1923, to January 25th, 1924, when the claim was settled by the payment of $6,000.
One week after the complainant's husband died, the defendant appeared at a meeting of the corporate planning board of the American Company, presumably as complainant's representative. He denied (page 1052) that he was there as the complainant's personal counsel. However, he testified: "I am sure if she asked for any advice I gave it to her. If that was being her personal counsel, I was, but it probably was matters relating to the company."
That his interest in complainant's business affairs was more than a brotherly one is also shown by the records in his law office. The docket in his law firm of Dowsey Schiel contains two pages headed "Autographic Register Company," and a third headed "Autographic Register Co. v. Weatherbest Stained Glass Co." (Exhibit C-224, pages 1161, 1163.)
Those pages would seem to show a relationship of attorney and client.
Notwithstanding the title headings of the aforesaid docket entries, and the defendant's denial that there was a relationship of attorney and client, his testimony in Sheffield v. Shoup is illuminating. It reads in part as follows:
"He [referring to Sheffield] was the attorney for the company, and I simply had no connection with the company whatsoever, except to occasionally be there with my sister. Q. You had no connection, you say, with the company? A. No, sir. Q. But you advised your sister, did you not? A. Yes. * * * Q. And kept fairly closely in touch with the company? A. I did." (See testimony herein at page 1271.)
And he testified in part, in Autographic Register Co. v. Namm (Exhibit C-110, page 260 thereof):
"Q. Did you have any connection other than simply an attorney advising the company? A. I was not even an attorney *Page 446 
for the company. Of course, Mrs. Shoup was my sister, and I gave her advice as my sister."
And in Autographic Register Company v. Sturgis Register Company (Exhibit C-111, page 323):
"A. Mr. Shoup died on July 4th, 1923, leaving the control of the Autographic Register Company to his widow, Mrs. Klaire D. Shoup, who had never had any business experience, but who was immediately elected president in his place instead. The Company had its own attorney, but I had always been my sister's personal counsel and from time to time, as matters arose in the Autographic Register Company, she would discuss them with me, and asked me to attend various meetings of different bodies that were being held in relation to the Autographic Register Company."
And in Oliver v. Autographic Register Company (Exhibit C-112, page 77):
"Q. When did you first become active in the affairs of the Autographic Register Company? A. Well, it is hard to answer that question; when Mrs. Shoup became president a day or two after Mr. Shoup's death, she questioned me upon certain matters, she had no previous business experience and I from time to time went to the office as her brother, to advise and confer with her, attending meetings of the planning board, made up of the heads of departments and officers, and as time went on I became more and more active until the time I took over the direction of sales and finally became president of the company."
On July 28th, 1923, he appears to have represented his sister in connection with the insurance on her husband's life, and secured a check for $3,284.49 (Exhibit C-10), from which she gave him a check for $800 (Exhibit C-11).
On October 8th, 1923, he sent a messenger to the complainant with a letter (Exhibit C-201) which, in part, reads as follows:
"to see if you could help me out of a bad situation. * * * the firm is rather short and cannot meet their rent, etc., today.
"I am around $250 short. Can you let me have that amount for a few days? If so, will you give the bearer check for this amount to the order of Dowsey, Parsons and Schiel, as it is their indebtedness *Page 447 
and will be paid by them? I didn't want to ask any of my personal friends for this, nor to put a note in the bank for such a small amount, as it would mean I would have to carry it two or three months and I didn't want to have to pay the interest. With love, Jim."
The complainant gave the messenger the check (Exhibit C-202). It was certified and went into the defendant's firm account.
The complainant stated that prior to her husband's death she was without business experience, and that immediately after his death when she was made president of the companies, she went to the factory and attempted to learn the business. That while she was so engaged, the defendant advised her in connection with her duties as president; that he attended the companies' meetings with her, and prepared resolutions, proxies, contracts, c. (page 60).
On August 23d 1923, the defendant conferred with the complainant, a Mr. Moore, and a Mr. Bouvier, the latter two being representatives of the American Sales Book Company, which sought to purchase the complainant's interest in the Autographic Register Company. The following day, on August 24th, he had another conference at the Hotel Belmont in New York City with the complainant and Messrs. Moore, Bouvier, Oren Moore and Barker about the American Sales Book Company's proposal to purchase the complainant's stock.
On August 21st, 1924, he wrote his sister (Exhibit D-23) concerning the American Sales Book Company's negotiations in which he said in part: "The only new feature in the negotiations which were mentioned early in August, 1923, is the injection by Mr. Sheffield of himself into the negotiations, which will necessarily result in considerable expense to you." He assumed an attitude of hostility toward Sheffield, who had been counsel of the American Company. (Exhibit D-19.)
In the negotiations with the American Sales Book Company, the defendant indicated that Justus Sheffield was the American Company's attorney, and also was representing the complainant in the negotiations of sale; but his sworn testimony on an examination before trial in a suit brought by *Page 448 
Sheffield against the company does not exactly sustain his testimony here. See Exhibit C-371, page 92, where it appears the defendant testified:
"Q. Now, up to or prior to October 1st, 1924, had you made any examination or study or investigation to determine what was the value of Mrs. Shoup's stock interest? A. I think so, yes, sir.
Q. Well, do you know? A. Why, I know that from the time Mrs. Shoup inherited from her husband that I was trying to find out and determine the value of all her assets, whatever she had. * * *
Q. Now, you were advising Mrs. Shoup as to the propriety of the sale of this stock, were you not? A. Yes, sir.
Q. And in connection with this offer of the American Sales Book Company, you advised her, did you not? A. Yes, sir."
Exhibit C-228 is a statement prepared by the defendant in connection with the Sheffield v. Shoup and Dowsey litigation, at which both complainant and defendant testified on an examination before trial on January 3d 1931 (Exhibit C-371), which bears corrections and additions made thereon in the handwriting of the defendant. In this statement appears the following:
"Justus Sheffield was never Klaire D. Shoup's attorney. One David C. Edwards was her attorney and administered the Estate of Walter C. Shoup, and her brother, James L. Dowsey, has always been her personal counsel.
"Justus Sheffield had been consulted both by Klaire D. Shoup and James L. Dowsey as her personal counsel, in reference to matters of the Autographic Register Company, for which Sheffield billed and was paid."
Compare this statement with Dowsey's testimony in this case (page 1056):
"Q. Mr. Dowsey, Mr. Sheffield represented the Autographic Register Company, did he not? A. He was attorney for the Autographic and he represented Mrs. Shoup and was her personal attorney, and she made the arrangements for the payment of his fees with him and everything else in the transaction when it got to be a sale proposition. (Page 1057.) *Page 449 
 Q. Now, Mr. Dowsey, isn't it a fact that Mr. Sheffield merely represented the company and that you were Mrs. Shoup's personal counsel? A. Well, if Mr. Sheffield represented the company, I don't know why he was in on any of the negotiations for the sale of her stock because that wasn't a company matter.
Mr. McNulty: May I have a direct answer to my question?
The court: yes.
By the court: Q. Yes or no. Did you represent her? A. I advised her. Mr. Sheffield in my opinion as a lawyer and from statements made to me by her as to both his services, conferences, and fees, was her personal attorney in the effort to sell the stock to the American Sales Book Company.
By Mr. McNulty: Q. Did you not take up this American Sales Book Company matter with Mr. Sheffield, you acting as personal counsel to your sister and Sheffield acting as counsel to the company, in the matter of the infringement of the patent, being a company matter? A. No.
Q. You are positive? A. Absolutely."
Despite this positive sworn testimony, directly at variance with the statement which he prepared for the attorneys in the Sheffield v. Shoup Case (Exhibit C-228), when confronted with the specific statements from Exhibit C-228 he refused to deny them (pages 1185-6):
"Q. Was the information contained in it true? A. So far as I know.
Q. On page 2, the last paragraph, I call your attention to this statement: `Justus Sheffield was never Klaire D. Shoup's attorney. One David C. Edwards was her attorney and administered the Estate of Walter C. Shoup, and her brother, James L. Dowsey, has always been her personal counsel.' Was that statement true? A. Well, I thought it was then. I will explain that if you want me to.
Q. And then on page three, first paragraph, `Justus Sheffield had been consulted both by Klaire D. Shoup and James L. Dowsey as her personal counsel, in reference to matters of the Autographic Register Company, for which Sheffield billed and was paid.' Was that statement true? A. It was.
Q. Was it true that you consulted with Mr. Sheffield as *Page 450 
your sister's personal counsel? A. I went with her when she talked with Sheffield, and, as I explained before many times ____
Q. Yes or no. Please answer my question. A. What is the question? (The pending question is read.) A. Yes."
The defendant wrote to the complainant on September 25th, 1924 (Exhibit D-24), in which he said:
"Dear Klaire: I have just finished a talk with Sheffield and I think not only has the time come for a show-down with the A.S.B. Co., but also with Sheffield. When I asked him what the letter was that followed the telegram he hemmed and hawed and finally said that it didn't amount to anything except to say that Vouvierre was expected in New York tomorrow morning. It seems funny that they would wire that letter is coming to announce this fact when they could announce this in the telegram. He also said that in reference to any counter-offer which you received that their attitude was that they were figuring it in their own way and that if anybody else wanted it at any other basis they could have it. Frankly, I don't believe a word of it, and if there is anything to this effect going on, any correspondence, I certainly would like to see the letters to verify the statements.
During the last two days I have used every effort possible to get in touch with Sheffield and get something definite out of him. I have come now to a stage where I don't like his position one bit. Unless he can be frank and open and give us all the facts, let us in on the conferences and give us all the facts, I for one don't care about dealing with him much longer. He is supposed to be your representative, looking out for your interests, no one else's, and there is no reason why there should be so much secrecy or he should be so reticent to disclose the facts.
I was over to the plant all morning, until a short time ago and everything seemed to be very pleasant and congenial while there. I hope that you will feel much better tomorrow. I will be back in town some time Tuesday morning."
In Exhibit C-374, dated January 15th, 1925, the defendant wrote Sheffield "of my own initiative without conferring with Klaire" after Sheffield's threat of litigation, he said in part:
"If you really feel that twenty-five thousand dollars ($25,000.00) is due you, the only way that I will ever advise Klaire to pay it is after a court of competent jurisdiction renders judgment against her.
Personally I believe that we have a complete defense to any action you might desire to bring. However, that is neither here nor there.
I am sure you will agree with me that after Walter died I tried in every way to be fair with you. I could have transferred the legal *Page 451 
business of this organization and Klaire's personal business to my own office, but I never attempted to take a dollar's worth from you, although I am a stockholder in the Autographic Register Co."
Sometime in the summer of 1924 Justus Sheffield called upon the complainant at her home in Milburn, and said that "she was sitting on a volcano" and that just then would be an opportune time for her to dispose of her interests in the companies, and asked her if she had any objection to his securing a proposition of sale. Sheffield got in touch with the American Sales Book Company and obtained a proposition from it to purchase complainant's stock in the American and Canadian companies for $225,000. The defendant was resentful of Sheffield's entry into the negotiations with the American Sales Book Company, and opposed the sale and challenged Sheffield's good faith and that of the representative of the American Sales Book Company. In October, 1924, it appeared that the negotiations with the American Sales Book Company would result in a sale. At or about this time there was a meeting of the district sales managers of the American Company in New York. These managers were under the supervision of the defendant who had in the meantime been employed as sales manager of the American Company. One of the men, Richter, called upon the complainant at her home and urged her not to sell but to let her brother, the defendant, run the business for her. An appointment was made for a meeting at the defendant's office in New York the next morning, October 11th, 1924. The complainant asserts that the meeting of the sales managers was designed to influence her against disposing of her interests to the American Sales Book Company, and to leave the field clear for the defendant to acquire control of her interests in the companies.
She says that as early as April, 1924, he told Arthur Pierce, the Canadian manager, that the complainant owned all but 80 shares of the stock of the company, and that he had an option on it. The defendant has admitted that he then had no such option as he is reported to have told Pierce.
The defendant's motive may be gathered somewhat from a letter to complainant from defendant's law partner written *Page 452 
in May, 1925 (Exhibit C-227), wherein it appears that in the summer of 1924 the defendant said he expected to be president of the Autographic Register Company.
At the time of the conference of October 11th, 1924, the defendant's testimony is that in a sideroom conference with his sister at that meeting he advised her to bring the matter of her negotiations with the American Sales Book Company to a conclusion. During the next few weeks thereafter, he exerted strenuous efforts to bring about a successful consummation of them. The defendant, however, did not produce his letter of November 1st, 1924, to Sheffield, which was acknowledged byExhibit D-26 of November 6th. Sheffield's letter quotes extensively from Dowsey's letter of November 1st, 1924, and refutes his testimony.
The Exhibits C-372, C-373, D-38, C-374, C-375, C-376, C-377,C-378, C-379, C-380, C-381, C-382, C-383, and C-385 show that the defendant was actively representing his sister in connection with the American Sales Book Company matter and Sheffield's claim for services in connection with it at the very time the optionExhibit C-6 was under discussion.
After the breaking off of the negotiations with the American Sales Book Company, and the writing of Exhibit D-28, which complainant testified was dictated by the defendant, he told her (page 1620): "that he didn't think either one of us could have any further confidence in Mr. Sheffield because he had played both ends from the middle in this A.S.B. sale, and that we ought to get rid of him, and if we got rid of him, of course he would take over the legal matters and become general counsel, and according to the by-laws I could delegate my powers as president and so he could become assistant to the president, and he thought for six months that arrangement would work out very well and would relieve me of the responsibility and care that I had been previously subjected to. I told him that sounded all right to me, and of course it was all predicated on his decision to leave his law practice, and if he had decided to do that, why, that was all right with me. In fact, I thought it would be a very amicable arrangement to enter into. Then he spoke that such a plan necessitated more time to be spent there and he *Page 453 
would practically spend most of his time under that arrangement, and that he thought he ought to be compensated accordingly, and somewhere along the line the figure of 8,500 was mentioned for the six months period, which was at a rate of $17,000 a year as he was already receiving ten as sales manager or director of sales.
"And he also spoke to me at that time about it being a temporary arrangement and he didn't know whether it would work out, but he thought there ought to be some arrangement made by which he could participate in this option, Mr. Brenn being the spokesman of a group of these employees, old employees, and I told him I felt sure if he spoke to Mr. Brenn such an arrangement could be made, and he spoke to Mr. Brenn and this option resulted.
"This is dated November 1st but I believe it was written, somewhere later in the month, this letter to Mr. Brenn from Mr. Dowsey, or from me. I think Mr. Dowsey dictated that."
At the time of his employment by the company the defendant's finances were at a low ebb, notwithstanding the fact that he had been paid by the American Company $10,000 a year as sales manager. The evidence discloses he spent little time at the company's plant attending to its affairs.
Richter, the manager of the Pittsburgh district, who attended the meeting of October 11th, testified that it was he and other employees that suggested to complainant, in her brother's presence, at the meeting, that she give up the idea of selling and let her brother take over the business, and they would work along with him. It was after this discussion that the defendant took his sister into a side room where they conferred together. There is a sharp conflict in the testimony as to the conversation that there took place between them. The defendant's position is that at this meeting the complainant put a great deal of pressure upon him to give up his law practice and come over and run her business. She denies this and insists that he told her that these salesmen wanted him to take over control of the company, and because of this he would have to give up his law business, and that she told him that that was a decision which must rest with him. She said that she would never ask her brother to give *Page 454 
up his chosen profession to come and help her; and this was confirmed by the witness, Richter, who said that her mind was that "she could not see how Jim could afford to give up his law practice to come into the company."
This would seem to be further corroborated by the written statement prepared by the defendant (Exhibits C-281 andC-283). Exhibit C-281 bears corrections in the handwriting of the defendant, prepared in 1929, before this suit was instituted, which seems to be directly contradictory to the defendant's version of the conversation in the side room. In the statement it was the defendant who was urging his sister not to throw up the sponge, "that he could continue along in charge of sales until such time as the whole situation could be cleared up and everybody knew where they were at." On cross-examination he admitted that his statement was true (page 1233) despite the fact that it was directly contrary to his other testimony.
On February 18th, 1925, Mr. Brenn, an employee of the company, submitted a formal option covering the 211 shares of the company's stock which he was authorized to purchase (ExhibitC-2). The defendant on the same day wrote a letter to Mr. Brenn (Exhibit D-53) in which he requested a copy of the option which bore date, November 1st (Exhibit C-2). In the letter the defendant lays emphasis upon the fact that one of the controlling reasons for the complainant turning down the offer of the American Sales Book Company was the option which the district managers and other employees wanted; and that their services entitled them to an opportunity to purchase her stock in conjunction with him, Brenn, and that Brenn had stated to her, the complainant, in asking for an option that it would be a benefit to the firm if other employees would join him in the purchase. Brenn's reply to Exhibit D-53 was Exhibit C-4, which bears the same date.
Brenn advised the defendant that he was negotiating with some people who were going to finance the deal to purchase the complainant's stock, and it was for this reason that he wanted a formal option; and he also asked for an extension of time. Defendant replied on the date of February 20th *Page 455 
(Exhibit C-106), declining to advise the complainant to give the formal option requested or to extend his time. The defendant entered into a dispute with Brenn as to the proper construction of Exhibit C-2, he taking the position that he was to have an option to purchase as many shares as Brenn and his fellow employees (page 13).
Brenn being dissatisfied with the construction the defendant placed upon the option, suffered the option to expire.
I am satisfied that the defendant schemed and planned to effect not only the cancellation of the negotiations with the American Sales Book Company and the option to Brenn, but the removal of Sheffield as general counsel to the company.
The complainant testified that (page 1620) coincidentally with the breaking off of the American Sales Book Company negotiations on the defendant's advice, she decided not to dispose of her interest in the company; that the defendant said he would continue in charge of sales, as he had since February; that he did not think they could have any further confidence in Sheffield because he had played both ends from the middle in the A.S.B. sale, and that they should get rid of him, and that he would take over the legal matters as general counsel, and that under the by-laws she could delegate her powers as president to him and he could become assistant to the president. (Page 1621.) This arrangement he suggested to run for six months; said it would work out very well and relieve her of the responsibility and care she had previously been subjected to; that this plan would require more of his time, and he would spend most of his time with the company under this arrangement and should be compensated accordingly. He suggested that he be paid $8,500 for the six months period. He also spoke about it being a temporary arrangement; but he thought there should be some arrangement by which he could participate in this proposed Brenn option. She told him to talk with Brenn. The joint option with Brenn resulted (page 1622). The defendant dictated the option as well as the letter of November 14th, 1924 (Exhibit C-198). But he testified Miss Muller prepared the joint option; although he may have made corrections in it (page 913). The defendant says that as part *Page 456 
consideration for the option he was to give more time to the company. He said the complainant called his attention to the provision in the by-laws providing that she as president could delegate powers (page 913).
Under the arrangement of November 14th, 1924 (Exhibit C-198) which the defendant dictated, Brenn was to continue in charge of production; the defendant was to act as assistant to the president, general sales manager and counsel. "As Assistant to the President, matters of administration, such as the office, finance, etc., will be in his charge. As General Sales Manager he will have charge of the Sales Promotion Department and all matters relating to same. As Counsel he will negotiate contracts, leases, general supervision of litigations, legal and financial questions and matters incidental thereto."
In the absence or inability of the president, it was provided that the authority vested in the president under the by-laws would be delegated to the defendant.
The complainant testified that it was upon the urging and advice of the defendant that she declined to give Brenn the option which he requested in February, 1925, and refused to extend the time beyond March 1st (page 67). She said the defendant also told her that the employees of the company, Miss Muller, Walter Oliver and Brenn and others were trying to undermine the company and take it away from her (pages 67, 69). The defendant then proposed to her that he alone take an option on her holdings at the price which the American Sales Book Company had offered her in the fall (page 70) as he did not want her to lose anything because of having given that up. He said if she would give him an option to purchase all her holdings in the company, 420 shares in the American Company and 1,200 common shares in the Canadian Company, for $200,000, he would guarantee her an income of $12,000 which was the current rate of compensation at the time he had figured on. He also said he would relieve her of the worry and obligation of endorsing company notes which she had done to some extent up to that date. He said he would arrange in some way to appoint her secretary of the American Company at a certain salary to be *Page 457 
agreed upon (page 71). He finally guaranteed her an income of $12,000 to be worked out by salaries of offices she held and to be about as follows: She would be named secretary of the American Company at a salary of $3,000 and secretary and treasurer of the Canadian Company at $3,000. He would take a $6,000 salary as president of the Canadian Company and endorse the check for that salary over to her making the $12,000 income (page 71). He felt under the circumstances, and for his magnanimous consideration of her, she would and should be willing under the option to give him the dividends on common stock if any should be declared. There was no prospect of paying dividends at the time he said; but if he made good as a company official, and made the stock worth it, he presumed she would have no objection to giving them to him (page 72); that his arrangement would free her of all worry and concern of the management of the two companies, which he said were threatened with bankruptcy; that she could come in when and if she cared to and sign checks. She asked him if he thought she could do that work and he said:
"Oh, I am going to bring over a Miss Collins, a secretary from his office, and she is very competent, and she could do that work, and I will advise and help, and there is Mr. Lanthier up in Canada who does that work up there, and you won't have much work to do. But you can do what you want to do, as little or as much."
An agreement incorporating these items was prepared by the defendant (Exhibit C-6), as follows:
"MEMORANDUM OF AGREEMENT made the 1st day of April, 1925, between KLAIRE D. SHOUP of Milburn, New Jersey, and JAMES L. DOWSEY of Manhasset, New York, WITTNESSETH:
WHEREAS said Shoup is the owner of four hundred twenty-two shares of Class `A' Common stock of the Autographic Register Company of Hoboken, New Jersey, and twelve hundred shares of the Common non-par value stock of the Autographic Register Systems, Ltd., of Canada, and
WHEREAS the said Shoup is desirous of having the said Dowsey take over the control, management and direction of the business conducted by said two companies, and said Dowsey is willing to do so, and
WHEREAS it is considered for the best interests of all the stockholders that this be done, *Page 458 
NOW THEREFORE, IN CONSIDERATION of the premises, the arrangements herein contained, and the sum of one dollar each to the other in hand paid by the said Shoup and Dowsey, the receipt whereof is hereby acknowledged, it is
COVENANTED, STIPULATED AND AGREED as follows:
1. That this Agreement shall be in full force and effect until March 31st, 1930, unless sooner terminated by the parties under the provisions hereof.
2. The Common Stock in the said two companies above-mentioned is to be issued as soon as possible in the name of Klaire D. Shoup, except so much thereof as may be necessary as qualifying shares for directors of the two companies, and by her endorsed in blank and to be deposited with an original copy of this Agreement in escrow with the First National Bank of Jersey City, New Jersey, with instructions to be delivered by them as hereinafter provided.
3. The said Dowsey is to have the right and option to purchase said stock as follows: Twelve hundred (1200) shares of Common Stock of the Autographic Register Systems, Ltd., of Montreal, Quebec, for Fifty-four Thousand ($54,000) dollars, Four hundred twenty-two (422) shares of Class `A' Common Stock of the Autographic Register Company of Hoboken, New Jersey, for One hundred forty-six thousand ($146,000) Dollars, at any time during the life of this agreement, said Dowsey to have the right to release from this Agreement stock from time to time in lots of not less than one eighth of the total number of shares of each company upon payment therefor of the proportionate amount due as above fixed.
4. During the life of this Agreement the business is to be so arranged and conducted that said Shoup is to have an annual income of Twelve Thousand ($12,000) Dollars per year, which said Dowsey hereby guarantees to her;
IT BEING UNDERSTOOD AND AGREED, HOWEVER, that if said Dowsey takes up the stock under the foregoing paragraph, (No. 3), such income shall be reduced in proportion to the amount of stock taken up and purchased by him.
5. In the re-organization of the Companies, said Dowsey is to be elected President of both corporations, said Shoup to be elected Secretary of the Autographic Register Company of Hoboken, New Jersey, and to be elected or appointed Secretary and Treasurer of the Autographic Register Systems, Ltd., of Canada.
6. The Twelve Thousand ($12,000) Dollar annual income above provided to Shoup to be arranged for the present as follows: In each of the above positions she to receive a salary of Three Thousand ($3,000) Dollars per annum. The said Dowsey to receive a salary as President of the Autographic Register Company of Hoboken, New Jersey, of Eighteen Thousand ($18,000) Dollars per annum, and of the Autographic Register Systems, Ltd., of Canada, at Six Thousand ($6,000) Dollars per year. As the salary is paid by the Autographic Register Systems, Ltd., such check to be endorsed immediately over to said Shoup.
7. During the life of this Agreement, or while said business is being conducted by said Dowsey, all dividends upon stock herein described *Page 459 
and hereafter declared shall be the property of said Dowsey; except such dividends or division of capital surplus as may be made or declared by the Canadian Company as of any date prior to January 1st, 1925.
8. Said Dowsey undertakes and agrees to save said Shoup harmless of any and all taxes which may be imposed by law of the performance of this Agreement or any part thereof.
9. Said Dowsey agrees to substitute his endorsement for the endorsement of said Shoup on any of the outstanding notes of said Autographic Register Company of Hoboken, New Jersey.
10. In event of the failure, consolidation or merger of either of the companies herein mentioned, the interest of the parties hereto shall be adjusted to give full force to the intent and spirit of this Agreement.
11. It at any time during the life of this Agreement and before said Dowsey fully pays the purchase price of said stock as herein set forth, the financial statement of the Company shows that its condition is not as good as at the date hereof, or in other words, that the value of the assets over the liabilities has decreased in any manner, then and in that event Shoup shall have the right and option to cancel this agreement upon ninety (90) days' notice to said Dowsey.
IN WITNESS WHEREOF the parties hereto have hereunto set their hands and seals on the day and year first above written.
 Signed: KLAIRE D. SHOUP (L.S.) Signed: JAMES L. DOWSEY (L.S.)
 Witness: MAE E. COLLINS."
The option, Exhibit C-6, is a product of the mind and hand of the defendant. It entirely represents his thought, and was wholly prepared by him. It in no way neglected him. He admits that he bargained for the control, management and direction of the complainant's property and his efforts were rewarded with success (page 1091). No consideration actually passed from the defendant for the option.
At the time of the execution of the option 358 shares of the stock of the American Company still stood on the company's books in the name of Walter C. Shoup; the other 62 shares were in the name of the complainant; the two qualifying shares heretofore referred to stood in the names of others, while the Canadian stock was recorded in the name of The Manifolding Devices Corporation. It will be recalled that the latter stock certificates were for 1,200 shares. They were in the custody of Sheffield who contended that he was entitled to a lien upon them for services rendered. *Page 460 
It will be noticed that the option provided that the common stock in the two companies was to be issued or transferred as soon as possible in the name of Klaire D. Shoup, excepting the qualifying shares; the stock so transferred was to be by complainant endorsed in blank and deposited with an original copy of the agreement in escrow with the First National Bank of Jersey City, New Jersey, with instructions to be delivered by them as provided in the option agreement. The stock was never delivered to the First National Bank in Jersey City.
The option enabled the defendant to purchase the 1,200 shares of the Canadian Company stock for $54,000, and the 422 shares of the Class "A" common stock of the American Company for $146,000, and it provided that the defendant had the right to release from the agreement from time to time stock in amounts of not less than one-eighth of the total number of shares of each company upon payment therefor of the proportional amount there due as therein fixed.
Under the fourth paragraph of Exhibit C-6, it was provided that "the business is to be so arranged and conducted that said Shoup is to have an annual income of Twelve Thousand ($12,000) Dollars per year, which said Dowsey hereby guarantees to her."
At the time the option agreement was entered into the business was paying the complainant $12,000 a year. The proofs indicate that the business was such that it would continue to pay her at least that sum. The option added to the American Company's payroll the defendant's salary of $18,000 which he received as president.
Paragraph six of the option provided that the $12,000 income for the complainant be arranged as follows: $3,000 salary from each company; and the defendant's salary of $6,000 a year as president of the Canadian Company would immediately be endorsed over to the complainant.
Paragraph seven of the option provided that while the business is being conducted by Dowsey, all dividends thereafter declared upon stock therein described, was to be the property of Dowsey, except such dividends or division of capital surplus as may be made or declared by the Canadian *Page 461 
Company as of any date prior to January 1st, 1925. The evidence shows that the dividends declared in February and July, 1928, were payable out of the capital surplus existing prior to January 1st, 1925, which obviously was contrary to the terms of the option.
Paragraph eight of the option provided that the defendant agreed to save the complainant harmless from any and all taxes that would be imposed by law by reason of the performance of the agreement, or any part thereof. There is no evidence to the effect that the defendant ever observed either the letter or spirit of this paragraph.
By the terms of paragraph nine the defendant agreed to substitute his endorsement for the endorsement of his sister on any of the outstanding notes of the Autographic Register Company of Hoboken, New Jersey. The defendant failed to perform that obligation. His sister continued to endorse notes for the company; although the defendant claims that such notes she did endorse were paid by the American Company, and that, therefore, she suffered no loss. However, this omission by the defendant evinced his indifference to his promise so far as his sister's affairs were concerned, and stands out as a complete failure by him of the consideration.
The complainant alleges that immediately prior to the time that the option was entered into, the defendant told her that the company was threatened with bankruptcy; and it was not until the lapse of a long period of time that she learned his statement was false.
The defendant testified on cross-examination that when he entered into the option, he dealt with his sister "on a cold business basis" (page 1052). He denied that the relationship of attorney and client then, or thereafter, existed; but when asked whether it would be fair to assume that he did not give her competent advice such as an attorney would give a client with respect to the option, C-6, he answered: "I gave her the best advice I could. I was a lawyer and naturally I gave her the best advice, both as a man, as her brother, and as a lawyer, that was in me to give her, and I didn't give her any advice at that time. That matter was closed at her solicitation." (Page 1051.) *Page 462 
The defendant was elected president of the Canadian Company towards the latter part of March, 1925, and under the terms ofExhibit C-6, his salary was then fixed at $6,000 a year. On April 7th, 1925, he was elected president of the American Company and as such his salary was fixed at $18,000 a year.
Under the terms of the option the defendant obtained immediate control of both corporations. When he became president of the Canadian Company, Pierce was dismissed from the office he held; and when he became president of the American Company, Miss Muller was dismissed from her position.
Without having exercised the option C-6 to purchase the complainant's stock, the defendant undertook to acquire Pierce's Canadian Company stock; and he finally procured an agreement to purchase it for $6,000. One thousand dollars in the form of a check was paid on account of the Pierce agreement in the City of New York. Shortly thereafter, the defendant wrote the Canadian Company's attorney, Mr. Whittaker in Montreal, stating that he was going up to that city to hold a meeting of the Canadian Company in order to obtain the money from the company to close the deal with Pierce.
He went to Montreal as announced, and a meeting of the directors of the Canadian corporation was held. The minutes of that meeting show that the only action then taken was to authorize Lanthier, a company official, to sign checks on the special account in the absence of Geraghty, also an official of the Canadian Company. Geraghty testified that the defendant approached him at the time and said he wanted a check for $6,000 out of the Canadian Company's funds; that he, Geraghty, thereafter telephoned the company's attorney, Callaghan, for advice as to Dowsey's demand, and Callaghan advised him that the money could not be advanced, and that it was contrary to law. Geraghty then informed the defendant that he could not be given the requested check. Notwithstanding, after the meeting of the board of directors, and without corporate sanction, $6,000 of the company's funds were paid to the defendant for which he gave no note or *Page 463 
security of any kind. The payment of the $6,000 was simply charged to him on the books. For two years the transaction was not mentioned in the company's statements, except that the item appeared under the heading of "sundry debtors." In succeeding years, as a result of a change in the law, it appeared as a loan to directors. The $6,000 aforesaid was transferred to the defendant's account in New York, and out of the money of this transfer, the balance of $5,000 was paid to Pierce; whereupon, the defendant received the Pierce stock. The complainant says that the Dowsey-Pierce stock transaction was wholly without her knowledge and consent. The defendant says that the complainant signed the $6,000 check in the Pierce transaction in Hoboken before he went to Canada. She denied this. The defendant's statement does not square with Geraghty's testimony that the defendant spoke to him in Canada about getting a check for $6,000. It may be safely assumed that if the check had been signed by the complainant, as alleged by the defendant, then there would be no reason for the defendant to talk to Geraghty about issuing a check for $6,000. The check has not been produced. The defendant did not cause the Pierce stock to be transferred to his name until the reorganization of the Canadian Company in 1927.
The stock acquired by the defendant from Pierce was two shares of the preferred and 104 shares of the common. In the reorganization of the Canadian Company in 1927, which took place while the defendant was in control of the company under the option C-6, the corporation redeemed its preferred stock at par plus a premium, plus all arrears of dividends which amounted to $135.92 a share. Notwithstanding the fact that the defendant acquired the Pierce stock by obtaining money as aforesaid from the Canadian Company, and although the loan had not been repaid the company, it redeemed the preferred shares held by the defendant on this basis and also issued ten new shares for each old share outstanding; so that the defendant acquired the cash for his preferred shares, as well as 1,040 shares in place of the 104 shares of old stock. The reorganization in 1927 was worked out by Callaghan and Whittaker under the defendant's directions. *Page 464 
Both Callaghan and Whittaker were associated with Elliott 
David, the Canadian Company's attorneys.
In the Sheffield transaction, Sheffield asserted a claim for services rendered to the complainant in connection with the American Sales Book Company negotiations. He had possession of the 1,200 shares of Canadian stock claimed to be owned by the complainant which stood on the books of the Canadian Company in the name of The Manifolding Devices Corporation. The defendant tried to get this stock back from Sheffield, but his efforts were unsuccessful. He consulted the Canadian Company's counsel, Callaghan, about the matter, with the result that between them they decided upon a plan of having the Canadian Company issue a new certificate for 1,200 shares on the false representation that the old one was lost or stolen. They thereupon caused the complainant to make application for the issuance of a new certificate, and a new certificate for 1,200 shares was issued in the name of Callaghan as trustee.
The defendant arranged to have the Canadian Company declare and pay dividends after the reorganization in 1927. While the certificate held by Callaghan as trustee was for 1,200 shares of stock, under the reorganization a new issue was created and for each share of old stock, the reorganization issued ten new shares; thus increasing the 1,200 old shares held by Callaghan as trustee to 12,000 new shares. In February, 1928, the defendant caused the complainant to make a further application to the Canadian Company for the cancellation of the Callaghan trust and the issuance in her name of 12,000 shares of the new Canadian stock.
On February 7th, 1928, the defendant obtained from the complainant an authorization to the company turning over to him all dividends to which she was or might have been entitled. He appeared at the directors' next meeting and caused a dividend of 75 cents a share to be paid on the stock. Thus, the dividends on her 12,000 shares, amounting to $9,000, were paid or credited to him on the books of the company. He used $6,000 of this dividend sum to pay the money to the Canadian Company which he obtained from it to buy the Pierce stock. There was an item on the books *Page 465 
in the sum of 300 odd dollars which was also paid with the dividend money. The item was charged to The Manifolding Devices Corporation. The balance of the dividend funds were transferred to defendant's account in Long Island, New York.
It is to be borne in mind that up to this last mentioned transaction the defendant had not exercised the option C-6.
The complainant testified that the defendant represented to her that the companies were not in a position to pay dividends, and would not be able to do so for a long time, as it required a great deal of work and effort on his part before they would be able to pay dividends. As above stated, he represented to complainant that the companies were on the verge of bankruptcy.
Complainant denied that she knew about the payment of the $9,000 dividend on her stock. The defendant justifies the payment to him under the terms of Exhibit C-6, and the authorization of February 7th, 1928. I am satisfied that the company's financial situation was misrepresented to the complainant; that the real facts were concealed from her, and that in signing the aforesaid authorization of February 7th, 1928, she did so through a deception imposed upon her by the defendant.
After the Canadian stock held by Callaghan as trustee had been transferred to complainant's name, the defendant planned to get it out of her name and into his own. Within something short of five months he approached his sister and told her that he was about to come into the possession of some money, and he wanted to exercise the option (Exhibit C-6); and therefore, he would make her a payment of $10,000 cash, and give her his note for the balance of $190,000 with the stock he obtained from her as collateral security. He thereupon prepared an agreement and other papers and caused the complainant to endorse the certificates of stock in both the American and Canadian companies to him. He proceeded to Canada with the Canadian certificates and caused a meeting of the company to be held. He had also with him his sister's (complainant) proxy or waiver and consent, which he presented at the meeting. She did not *Page 466 
attend the meeting. Those present were the defendant and Mr. Hillenbrandt, an employee. The meeting was held, and the first order of business therein was the transfer of complainant's 12,000 shares of stock to the defendant. The second order of business was the declaration of a dividend of $1 a share; and the third order of business was an increase in Hillenbrandt's salary of $600 a year. The defendant then arranged to transfer these dividend moneys to his account in New York, and out of the sum so obtained, he drew a check for $10,000 and delivered it to his sister as a down payment on the purchase of her stock. He collected the dividends paid on complainant's stock while it stood in her name before he had title to it, in order to make the payment for the purchase of her stock.
He also acquired ten shares of stock from the complainant to qualify him as a director in the Canadian Company. He also acquired ten shares as a result of taking over one of the qualifying shares outstanding in the 1927 reorganization. He gratuitously acquired 13,060 shares of the Canadian Company stock.
The defendant prepared and had the complainant execute an agreement, Exhibit C-7, dated June 29th, 1928, which provided that the agreement dated April 1st, 1925, the option ExhibitC-6, was to be canceled, surrendered, and annulled without any rights to either party as against the other. He thereby boldly attempted to foreclose the complainant from any title to the moneys which he had obtained by way of dividends on her stock. In common parlance he "out-Ponzied Ponzi," and evolved a scheme in high finance that, by comparison, made that ill fated "get-rich-quick" manipulator's achievements appear extremely puerile. His fortunes overnight underwent a kaleidoscopic change; from the lowly estate of a borrower, he pyramided to the status of a master in finance.
Under paragraph two of Exhibit C-7, a note for $190,000 which was delivered to her, was to bear interest until paid at the rate of six per cent. per annum. The note itself contained no such interest provision (Exhibit C-8). No reason for the omission is given. *Page 467 
 Exhibit C-7 further provided that the complainant covenants and agrees to apply against such interest any and all sums she received as salary from either the Autographic Register Company of New Jersey or the Autographic Register Systems, Ltd., of Canada, or both of them. Notwithstanding her employment as secretary and treasurer of the corporations, whatever moneys she received therefrom was required to be applied to the defendant's obligation of $190,000.
Paragraph five of Exhibit C-7 provided that when the principal due upon said note is reduced to $175,000 or less, the salary or salaries received by the complainant, "will either be adjusted to conform with the interest accruing upon said note, or if the sum received by said Klaire D. Shoup is in excess of such interest the same will be paid by her to the said James L. Dowsey."
It will be noted that the so-called guarantee of $12,000 a year provided for in Exhibit C-6, does not appear in Exhibit C-7, nor does any statement appear in Exhibit C-7 as to how the $12,000 which the complainant was to receive was to be paid to her.
While the complainant was obligated to apply any salary which she received from the companies against the interest which the defendant owed her on his personal note, there was no provision for the payments of these moneys out of the respective companies. On a separate sheet of paper which the defendant alone signed, he agreed "to save Klaire D. Shoup * * * harmless from any and all amounts which she might either have to pay on taxes of any nature whatsoever or for services rendered by one Justus Sheffield in relation to the sale or negotiations for the sale of 420 shares of the stock of the Autographic Register Company to him or the same amount of stock or more or less of it to the American Sales Book Company Limited of Canada."
Just what the effect of these provisions is, is not altogether clear; but the fact remains that under them the defendant has never paid out any money nor has he ever paid the note for $190,000. The note (Exhibit C-8) is payable 60 days after demand.
When the defendant informed his sister that he was going *Page 468 
to take up the option C-6, he immediately caused the 420 shares of the American Company stock to be issued in his name. He then wrote a letter to complainant explaining that he was delivering a note for the 420 shares of the American Company stock, and that it was understood that the Canadian stock would be delivered to him just as soon as it could be transferred to him and proper endorsement made, which he undertook to have done on or before July 10th, 1928. On the last mentioned day he wrote another letter referring to the communication of June 9th, 1928, and handing her the certificate for 12,000 shares of the Canadian Company stock for her signature as secretary and she was to retain it as collateral security for the note.
That completed the transaction by which the defendant obtained his sister's stock without the payment of any money. At no time does it appear that the defendant had in his possession sufficient moneys to pay the alleged purchase price of the stock, nor does it appear that he intended to pay any price, or to pay the interest on the note out of his own funds.
In addition to receiving the dividends above mentioned, the defendant received dividends in 1928 at the rate of $1.75 a share on the 1,040 shares of the Pierce stock which were purchased with the dividends on the complainant's stock. Moreover, in addition to these, he applied to his own use the dividends on the qualifying shares which were the complainant's husband's property and which came to her under his will.
From April, 1925, to July, 1928, the defendant received in salaries from the American Company, $18,000 a year, so that over a period of three years, he received in salaries the sum of $54,000 from the American Company; and $6,000 a year from the Canadian Company. He received in dividends from the Canadian Company on his sister's stock, the sum of $21,000.
The complainant did not attend any of the meetings in Canada at which the dividends were declared, and was ignorant of the declaration and payment. She did not know that the defendant had collected in 1928, $21,000 as dividends on her stock and $1.75 per share on the Pierce stock, *Page 469 
nor that the defendant, in addition, appropriated the dividends on the qualifying shares which were also her property.
I am satisfied had she known that she as the owner of the stock, was entitled to these large dividends, and was truly and properly advised thereto by the defendant, no such agreements asExhibits C-6 and C-7 would have been executed by her. The defendant at no time made a disclosure of the true facts to her. He, I am convinced, studiously concealed them. The 1928 income tax return which he signed and filed as her attorney, reported $9,017.50 as dividends received by the complainant (moneys which she did not receive, but which he appropriated, claiming to be entitled to them under the terms of Exhibit C-6 and the authorization of February 7th, 1928).
Upon returning from Canada to Hoboken, he wrote her advising her that he took care of her Canadian income tax and that he paid it for that year 1928, and also for the last year, and that if there was any refund, she could keep it and that he did not want to be reimbursed. As a matter of fact, there was nothing due on her income tax that year or the year before.
The defendant attempts to explain this situation by saying that he was referring to his income tax on moneys which he was turning over to her, and which she was to pay. If he were referring tohis own income tax, then he gave no explanation as to just how she would be entitled to a refund.
While the defendant was in control of the companies under the provisions of option Exhibit C-6, it developed that the assets of the American Company had been very much depreciated on the books, with the result that the book values grossly understated the value of the assets of the company (page 422). The defendant was so informed by Pace Pace, who suggested an appraisal. On February 6th, 1926, the Standard Appraisal Company made an appraisal and effect was given to this appraisal on the books of the company as of December 31st, 1925, at a value of $478,090.23 on the fixed assets (page 416). Before the appraisal the same assets were shown on the books of the company at $192,252.28, making a total write-up of $285,837.95. *Page 470 
The common "A" stock on January 1st, 1925, had a value of $262.95 per share (page 418). At the end of the same year the write-up of the assets was $365 per share, or a book value of approximately $625 per share (pages 419, 420). As of December 31st, 1927, it was approximately $600 per share.
The Shoup-Oliver patents, about which the defendant testified in the Autographic Register Co. v. Namm case, supra, was the principal asset of the company, and is included in the foregoing book value figures at $36,280 (page 423). If that asset had been capitalized at its real value in 1928, when the defendant obtained the agreements Exhibits C-7 and C-8, the book figures it would appear would have materially increased. It is evident the defendant knew about the appraisal, and that the books did not reflect the real value of the assets in 1925.
It appears that from the time of the complainant's husband's death in 1923 up to and including the date of the 1925 option agreement, Exhibit C-6, the defendant had a thorough knowledge of the condition of the American and Canadian companies' business and financial affairs and was aware of the real worth and value of the complainant's holdings in the companies.
Considering the complainant's testimony to the effect that the defendant frequently told her that the company was on the verge of bankruptcy; that he found the financial statements of the company which had been furnished were vague and that those given to Sheffield in the American Sales Book negotiations were inconsistent and could not be verified, coupled with all the other testimony — oral and documentary — one, therefore, is led to the logical conclusion that the complainant was wickedly imposed upon and is the innocent victim of misplaced trust and confidence.
Very shortly after obtaining the 1925 option, Exhibit C-6, the defendant undertook to effect a sale of the assets he obtained under the provisions of the option. (Exhibits C-365,C-347, C-366.) On January 3d 1927, he wrote to Business Systems, Ltd., of Canada (Exhibit C-348) expressing a willingness to dispose of the assets for approximately $500,000. On August 2d 1927, he wrote Flint Young *Page 471 
that he could deliver approximately 600 shares of stock in the American Company for $900 a share, and would deliver control of the Canadian Company for $150,000 in the event of a sale of the American Company (Exhibit C-116). It appears that he negotiated with the Globe Register Company through its representative, a Mr. Boyd, in February, 1928 (Exhibit C-546). Negotiations for the sale were resumed with the American Sales Book Company by the defendant after he became president in 1925 and were continued from time to time thereafter. In 1929 the defendant offered the American Sales Book Company 14,040 shares in the Canadian Company at $15 a share, and 600 shares of the American Company common stock at $725 a share. All of which established a selling price of approximately $665,000 (Exhibit C-349). The negotiations subsequently failed. See Exhibits C-350, C-351, C-352.
Then on April 11th, 1930, the defendant again sought a purchaser of the stock. He communicated with a Mr. Rice (ExhibitC-353), stating that he would not consider less than $1,000 a share for the common stock, and for the preferred stock a sum running between $110 and $125.
In 1936 the UARCO offered the sum of $575,000 for the assets of the company (Exhibit C-531), which was not acceptable to the defendant. See Exhibits C-532, C-364, C-367.
It appears that the lowest price which the defendant would accept for a share of the stock was the sum of $725, that being the sum named in the negotiations with the American Sales Book Company.
The balance sheets prepared by Mr. Timm on the instructions of the defendant, indicate that the American Company was valued at $750,000, which would establish a value of the common shares between $650 and $1,000 a share. (Pages 1475, 1478.)
The complainant asserts that notwithstanding the express provisions of the agreement of June 29th, 1928, Exhibit C-7, that complainant's salary was not to be reduced until the payments on the note brought it down to $175,000, yet the defendant caused her alleged income to be reduced from *Page 472 
$12,000 to $11,400 without him having made any payment on the note. He claimed credit for the $600 difference although under the terms of Exhibit C-7, he plainly is not entitled to it (pages 983, 1126).
Under the agreement C-7, the complainant was to credit her salary against the interest due her from the defendant. That provision in effect gives the defendant a gift of the complainant's earnings in the companies. It implies no favorable suggestion of brotherly love on the part of the defendant, but stands out as confirmation of a deal founded on a "cold business basis." This provision, with others in the cause, is wholly unfair, grossly unjust, and completely at variance with the principles of equity and good conscience.
The defendant undertook to exploit the complainant of $3,300, and to cut the balance due her to $1,856.10. He caused the account to be carried back to July, 1928, and offset her out of pocket losses with a credit of the alleged difference between $12,000 due her as salary, and interest at 6% on the defendant's note as mentioned above. The account shows that the items charged by the complainant were actual cash payments or cash losses sustained by her.
In December, 1933, there was a restoration of salary cuts in the Canadian Company whereby the complainant's restored "cuts" never reached her — they did, however, get into the defendant's bank account. See Exhibits C-52, C-53, C-54, C-55, C-56, C-57,C-58, C-64. In February, 1932, there was a reduction in the salaries of the officers of the Canadian Company of 10%, which became effective in February, 1932. In June of the same year, a further cut of 10% was ordered. Then in March, 1933, the Canadian Company by resolution authorized the president of the company (the defendant) to restore the pay cuts of 1932. The defendant on November 30th, 1933, exercised the discretion given him under the resolution and restored the pay cuts to the various officers. He thereby obtained $540 under the restoration resolution, while the complainant became entitled to $270. (Exhibits C-56, C-53.) While the check was made payable to the complainant, she never received it and had no knowledge of its existence. Her name was endorsed on the check by Mrs. Hanlon (formerly Miss Collins), the defendant's secretary, and the *Page 473 
check was deposited in the defendant's account at Manhasset, New York. Mrs. Hanlon testified that she endorsed the complainant's check at defendant's direction.
On December 5th, 1933, there was a further restoration of pay cuts, which was worked out in this way: There was a fund of $3,426.36 available. That amount was withdrawn from the account of the Canadian Company by a check signed by the defendant and Hillenbrandt aforesaid, and payable to the order of J.R.D. Lanthier aforesaid (Exhibit C-57). Lanthier distributed this check, not on the basis of salary cuts, but on the basis of share holdings of the various officers. The moneys were not payable as a dividend since the stockholders did not receive a pro rata
share. They only were distributed to the officers of the company who were stockholders. Under that arrangement, the defendant received $3,196.30, while the complainant's share amounted to $2.45 (Exhibit C-58). The complainant's check and the defendant's check were lumped together, making a total of $3,198.75 (Exhibit C-57) in Canadian funds. It was converted into American funds at a premium of approximately $40, and the defendant received a check (Exhibit C-57) for $3,234.74, representing both his and the complainant's share in American funds and the premium. This check was endorsed by the defendant and deposited in his bank at Manhasset, New York (ExhibitC-57). The complainant never received her share of it.
While the name "Klaire D. Shoup" appears on pages 128 and 130 of the Canadian minutes (Exhibits C-55 and C-52), the complainant declares that those signatures are not hers; that she never signed them.
The defendant received from the American Company in salaries and dividends a total of $324,590.70, and from the Canadian Company he received $146,060.47, making a grand total of $470,651.17. In addition, the defendant's law firm received various sums of money for legal services.
While the defendant testified that he devoted considerable time to the company's business to the neglect of his law business, the testimony of Mrs. Hanlon and Mr. Timm challenges the truth of his testimony. They both stated that the defendant devoted little time to the company's business. *Page 474 
Their statements seem to be supported by the defendant's testimony in connection with the sales and merger, wherein he declares the business practically ran itself. While the defendant claims credit for the increase in the value of the company's stock as reflected upon the books, and alleges that the increase was the result of his efficient management, complainant says that the net income during the years in question was occasioned as a result of the returns from the Shoup-Oliver patent through royalties, damages for infringement, which amounted in excess of $225 per common share of stock, and concluded with the statement that the defendant was "a most expensive luxury to the companies" — and that observation seems to be borne out by the expense accounts.
The defendant charges that the complainant is guilty of laches. The answer to that allegation is that the complainant did not learn of the violation of her rights until she consulted counsel in 1940, and that she, then, with reasonable diligence and promptness instituted this suit.
In 1939 defendant presented the complainant with a new plan — a reorganization he called it — designed to accomplish two things: to get rid of his note for $190,000 without his paying it, and to eliminate his obligation to pay taxes under the 1928 arrangement.
In exchange for his note complainant was to receive preferred stock of the American Company, and the note was to be canceled. The preferred stock was to be subject to retirement. The plan also contemplated the defendant's getting the Canadian stock as well. His conduct with respect to this proposal awakened his sister's suspicion. His explanations proved unconvincing, her confidence in him was weakened, and in the spring of 1940 she took counsel.
It is well established law that the rule of investigation does not apply where as here there exists a relation of trust and confidence which disarms the victim. Sabatino v. D'Aloise,107 N.J. Eq. 426; 152 Atl. Rep. 761.
In Sun Building and Loan Association of Newark v. Rashkes,119 N.J. Eq. 443; 183 Atl. Rep. 274, appears:
"Equity will not permit the statute of limitations to give aid and comfort to a transgressor by barring relief to a victimized client, who has exercised due diligence. *Page 475 
"It is a well settled rule in equity that in cases of fraud the time limited within which the action must be brought will not commence to run until the discovery of the fraud, or until the complainant was in a situation where by the exercise of reasonable diligence, he would have discovered the fraud."
A party who is entitled to set a transaction aside is not to be charged with delay, or with acquiescence, or with ratification, unless there has been knowledge of all the facts and complete freedom of action. Acts which might appear to be acts of acquiescence, will not be held to be such if the client is ignorant of the circumstances. Certainly this defendant kept the complainant ignorant of the true facts in the transactions here under consideration. Laches is a defense not regarded with favor where an attack is made upon a contract between parties standing in a confidential relation to each other. "Length of time weighs less in such a case than in any other." See Turnley v. Nixon,112 N.J. Eq. 116; 163 Atl. Rep. 800.
The proofs in this case in my opinion clearly establish that there was a fiduciary relationship of attorney and client existing between the parties hereto at the time the aforesaid transactions were entered into and it began from the time of the death of the complainant's husband in 1923, and continued up to a short time before the bill was filed in this cause — when the complainant consulted counsel.
The defendant takes the incongruous attitude of denying that a relationship of attorney and client existed between him and his sister, yet he here admits orally and by documentary proof that he gave her legal advice concerning her business affairs and acted as her personal counsel in connection with her business. He stresses the fact that he was not paid for his services as such. I am inclined to believe that the defendant's denial of the existence of the relationship of attorney and client rests upon a too narrow view of the relationship. If one assumes to give legal advice and counsel, he takes over the role of an attorney, and the principles of law applicable to attorneys who deal with their clients, apply with equal force. 2 Pom. Eq. Jur. (4th ed.)2071 § 960. While the relationship may be said to rest upon contract, formality *Page 476 
is not an essential element of the employment. Rodgers v.Bromberg, 53 Fed. Rep. 2d 723; cert. den. 285 U.S. 542;76 L.Ed. 934; 52 S.Ct. 314. Payment of fees is not a necessary element. It may exist even though the services are rendered gratuitously. 7 Corp. Jur. Secundum 703; Wright v. Smith,23 N.J. Eq. 106; Rogers v. Genung, 76 N.J. Eq. 306;74 Atl. Rep. 473; Harrop v. Cole, 85 N.J. Eq. 32; 95 Atl. Rep. 378;affirmed, 86 N.J. Eq. 250; 98 Atl. Rep. 1085. See, also, Dunn
v. Dunn, 42 N.J. Eq. 431; 7 Atl. Rep. 842.
The defendant suggests that since he was a New York attorney and not a New Jersey attorney, he could not represent the complainant in New Jersey. Assuredly, he could not appear in our courts unless admitted pro hac vici; but there was no bar against him representing her in the matters about which she has charged. He claims that Sheffield had represented her. However, he omits to state that Sheffield too was a New York and not a New Jersey attorney. 7 C.J.S. 703.
The relation of attorney and client existing between the parties, the validity of these transactions must be determined by rules of law which are not applicable to ordinary cases. There is ample authority for the principle that "The confidence which the relation of attorney and client begets between the parties, and the influence which the attorney thereby acquires, has led to a very close scrutiny of all transactions between them, and the law often interposes to set aside contracts which, between other persons, would be subject to no exception. In such cases, the burden of establishing the perfect fairness, adequacy, and equity of the negotiation is thrown upon the attorney, and in the absence of such proof, courts of equity treat the case as one of constructive fraud. 1 Story's Eq. section 311. In Gibson v.Jeyes, 6 Vesey 278, Lord Eldon expresses the rule to be, `that if he will mix with the character or attorney that of vendor, he shall, if the propriety of the contract comes in question, manifest that he has given his client all that reasonable advice against himself, that he would have given against a third person.'" Condit v. Blackwell, 22 N.J. Eq. 481.
The requisites which equity exacts in such transactions *Page 477 
from an attorney to sustain his purchase from his client are, on his part, perfect good faith, absence of pressure of the influence acquired by the confidential relationship, and the imparting of such information and disinterested advice to the client respecting the transaction, and on her part, complete knowledge of the situation and entire freedom of action. The court is not required to determine that the attorney actually failed in the performance of these required duties. The invalidity of the transaction will result from a judicial determination that he has failed to show that he performed those duties. Dunn v. Dunn, supra.
It is abundantly clear from the proofs that the defendant occupied a position of superiority over the complainant with respect to her business affairs. In one of the written statements which the defendant prepared, or assisted in preparing, long before this present controversy arose, he said, "Furthermore, at no time during her presidency of the Autographic Register Company did Mrs. Shoup make any decision of importance without the advice of her brother, Dowsey, * * *." (Exhibit C-228.) When confronted with this statement on cross-examination, he admitted it was true (page 1194).
When the defendant first entered the employ of the companies, he was conferring no favor upon the complainant. He was being well and adequately paid for the services rendered by him to the companies. He was rendering no particular service to the complainant for which he should be compensated by her. The defendant concealed from her the true facts concerning the financial status of her controlling interests in the companies, and frequently exerted the pressure of the influence of their relationship upon her. The transaction of the 1925-1928 option agreements bears all the earmarks of both constructive and actual fraud upon the complainant. 2 Pom. Eq. Jur. (4th ed.) §§900-902; Keen v. James, 39 N.J. Eq. 527; Ricketts v.Tompkins, 73 N.J. Eq. 552; 68 Atl. Rep. 1075; 74 N.J. Eq. 300;68 Atl. Rep. 1075; Roberts v. Tompkins, 75 N.J. Eq. 576;73 Atl. Rep. 505; Gordon v. Schellhorn, 95 N.J. Eq. 563;123 Atl. Rep. 549. See Purcell v. Enright, 31 N.J. Eq. 74; Crocheron
v. Savage, 75 N.J. Eq. 589; 73 Atl. Rep. 33; *Page 478 Turnley v. Nixon, supra; In re Romaine, 113 N.J. Eq. 477;167 Atl. Rep. 683; Daly v. Watson, 118 N.J. Eq. 258;178 Atl. Rep. 781; affirmed, 121 N.J. Eq. 250; 190 Atl. Rep. 323; Sun Buildingand Loan Association v. Rashkes, supra. See, also, Brown v.Bulkley, 14 N.J. Eq. 451; Perkins v. Robertson, 92 N.J. Eq. 692; 114 Atl. Rep. 856; Losee v. Cale, 7 N.J. Mis. R. 321;Povey v. Ready, 87 N.J. Eq. 199; 100 Atl. Rep. 556; Dwyer v.Anderson, 113 N.J. Eq. 210; 166 Atl. Rep. 293.
In the matter of In re Peppler, 132 N.J. Eq. 421;28 Atl. Rep. 2d 474, the court said:
"It appears that John G. Peppler occupied a fiduciary position. It was a relationship of trust and confidence between him and his mother. He prepared her will and procured the attesting witnesses thereto. He substantially profited under the terms of her will. The fiduciary relationship placed upon him the burden of establishing by clear and convincing proof that he did not abuse the trust and confidence reposed in him."
In the instant case the complainant placed her entire estate in the defendant's hands, when she was physically and mentally disturbed by family troubles and business responsibilities. She had had little or no business experience or business dealings. She trusted the defendant implicitly. She relied on his advice and judgment, and would not act in any matter without it. In fact, he encouraged her to rely upon him. She trusted not wisely but too well.
I believe she is entitled to the relief she seeks. The 1925 agreement, as well as the 1928 sale, and its incidents, will be set aside. The defendant will be directed to turn back complainant's stock in the aforesaid companies, and to account for all dividends and income thereon. The stock obtained from Pierce and paid for with complainant's dividends will be impressed with a trust in favor of complainant, and defendant will be directed to convey it to her, and to account to her for all dividends and income received thereon. Defendant will also be required to account to complainant for her qualifying shares, and for all dividends and income thereon, and for all moneys derived by him from the use of complainant's property. *Page 479